CITY NATIONAL BANK *v.* McCANN.

4-4475

Opinion delivered April 12, 1937.

968

*James B. McDonough, W. L. Curtis* and *Joseph R. Brown,* for appellants.

*Hill, Fitzhugh & Brizzolara, Ira D. Oglesby, Warner & Warner, Roy Gean* and *George W. Dodd,* for appellees.

Butler, J. Plaintiffs, Mrs. J. A. McCann, Ruby Washington, D. H. Moore, Mrs. W. T. Moore, E. N. King, J. A. and P. L. Riggs and J. C. Carroll, instituted separate suits in the chancery court of Sebastian county against City National Bank and I. H. Nakdimen, its president, as defendants. Involved in these cases are three sets of bonds—two bond issues of the East Oklahoma Publishing Company of $75,000 and $50,000, respectively, the notes of W. L. Sharp secured by mortgage on real estate, and bonds of the Dodson Avenue Methodist Episcopal Church. The plaintiffs were customers of the defendant bank and, as such, kept with it various deposits in savings accounts which were used to purchase some of the bonds above mentioned. The several suits

were instituted praying for a rescission of the sale of the bonds made to plaintiffs and for judgment for the face amount thereof with accrued interest.

As ground for the relief prayed, it was alleged in the several complaints that a fiduciary relation existed between them and the bank and I. H. Nakdimen by reason of the manner in which their business relations had been conducted during the time they had been customers of the bank; that because of this relation they relied upon the superior business judgment and integrity of the bank and its said president; that the bank, acting through its president, induced plaintiffs to purchase the bonds involved by falsely and fraudulently misrepresenting their value; that the statements were in effect that the bonds were "gilt-edge" or "as good as gold" and that if plaintiffs, at any time, were dissatisfied with the investments, a repurchase of the bonds would be made at par, and other statements indicative of the character of the investments as safe and conservative; that plaintiffs were not advised and did not know the value of the bonds, but relied wholly on the statements made; that they later discovered the bonds were not such investments as represented and not safe and conservative; that defendants have failed and refused to repurchase said bonds at par as agreed.

The answers denied the material allegations of the several complaints and, in some of the cases, set up certain affirmative defenses which will be hereafter noticed. The cases were consolidated for trial over the objection of defendants and, upon the testimony adduced, the trial court made findings of fact and declarations of law.

In finding of fact No. 1, the trial court recited certain matters which it found were established by the weight of the testimony from all of which it found as a matter of fact that the bank was the agent of the plaintiffs in making the investments sued on and that a fiduciary relation existed between the plaintiffs and defendants with respect to the making of such investments.

Finding of fact No. 2 related to the Sharp notes and Methodist Church bonds which will be discussed later.

Finding of fact No. 3 related to the details of the investments in the bonds of the East Oklahoma Publishing Company. With respect to these bonds the court found that the investments were made while the fiduciary relation existed between plaintiffs and defendants; that plaintiffs knew nothing of the company, the value of its bonds, or of any interest which the bank or I. H. Nakdimen, its president, had in said company, and relied wholly upon the bank, acting through its president, to make investments in safe, marketable securities, and accepted them, as in all other instances, upon the belief that they were sound investments. They did not learn until much later that I. H. Nakdimen had an interest in the company and were unacquainted with the terms of the bonds which had been in possession of the bank until a short time before the institution of these suits. Other findings related to the manner in which the information was received as to the real nature of the investments, the nature and character of the assets of the East Oklahoma Publishing Company found to exist and the court found that plaintiffs acted promptly and without laches after making such discovery. Other facts found to exist, contained in finding of fact No. 3, related to the organization, ownership, nature and character of the assets of the East Oklahoma Publishing Company; also, relating to the disposition of the bonds and certain indebtedness owed by the former owners of the assets conveyed to the Oklahoma Publishing Company at the time of its organization. From the facts found to exist, the trial court found that the bank was bound by the knowledge of its president of the affairs of the East Oklahoma Publishing Company.

The court found that the securities were represented by I. H. Nakdimen as being conservative and safe investments when, in fact they were not of that character, which full information of the character of the assets securing the bonds would have disclosed, and that withholding such information amounted to a fraudulent concealment of the facts.

Under findings of fact No. 3 the trial court held that the plaintiffs were entitled to rescission of the sale of

the bonds of the East Oklahoma Publishing Company, but denied the prayer for rescission as to the bonds of the Methodist Church and the Sharp notes. Thereupon, the court rendered, and caused to be entered, a decree in conformity with the findings of fact and declarations of law. To that part of the decree granting relief as to the East Oklahoma Publishing Company bonds defendants have appealed, and, to that part of the decree denying the relief prayed as to the Sharp notes and church bonds, plaintiffs have prosecuted a cross-appeal. We will discuss first the questions raised by the direct appeal.

■ For reversal, the appellants contend (1) that the City National Bank did not own or sell the East Oklahoma Publishing Company bonds and had no interest therein; (2) that the evidence is wholly insufficient to show any fraud, or that the publishing company was insolvent at the time the bonds were issued, or that it is now insolvent; (3) that plaintiffs did not rely upon the alleged misrepresentations; (4) that plaintiffs' loss, if any, was not because of any wrongful conduct on the part of Nakdimen or the bank, but because of economic conditions. Grounds for reversal Nos. 5, 6, 7, 8 and 9 relate to all of the plaintiffs incidentally, but more particularly to plaintiffs E. N. King, J. A. and P. L. Riggs; number 10 is the contention that plaintiffs by their conduct have affirmed the purchases and are not entitled to rescission; number 11 is that there were no confidential relations between plaintiffs and defendants; number 12 contends that Nakdimen exercised due care in the purchase of the bonds for the plaintiffs, which was the extent of his duty; number 13 contends that defendant bank was without authority to act as broker and its repurchase agreement, if made, is void; number 14 contends that defendant bank is not bound by the acts or knowledge of I. H. Nakdimen with relation to the East Oklahoma Publishing Company; number 15, that plaintiffs had their bank books balanced, checks and vouchers returned, and no objection was made thereto within a reasonable time; number 16 is an argument on the weight of the evidence, and number 17 is the general contention that the findings of

fact by the trial court are against the weight of the testimony.

Except as to grounds Nos. 5, 6, 7, 8 and 9, relating particularly to plaintiffs King and Riggs, and Nos. 10, 13, and 15, we are of the opinion that the case may be discussed and disposed of under the general contention No. 17, to-wit, that the findings of fact are against the weight of the testimony.

Because of the immensity of the record and the manner in which counsel have presented the case for our consideration, we have experienced much difficulty in discovering just what the evidence is in its entirety although we have made diligent investigation of the abstracts of the testimony and explored the transcript, also, to some extent. As to some aspects of the case there seems to be but little conflict in the evidence. One of these relates to the first finding of fact made by the trial court and the 11th ground for reversal presented by the defendants; that is, the question of the fiduciary relation existing between plaintiffs and defendants. To our minds the overwhelming weight of the testimony, if, indeed, not all of it, supports the conclusion reached by the trial court that there was such relationship between the parties. Mr. I. H. Nakdimen is clearly shown to have acquired a strong and preponderating influence over the bank itself and its customers. The plaintiffs had been the customers of the bank for a considerable period of time before the transactions occurred out of which this suit has arisen. Notwithstanding the contention made by defendants that plaintiffs are business people of wide experience and information, we have concluded that just the opposite is true. They appear to have been thrifty and economical, establishing savings accounts in the defendant bank to which they added from time to time and which, from time to time, the defendants withdrew to invest in such securities as they thought proper for the benefit of these plaintiffs. Practically from the beginning of plaintiffs' dealings with the bank they left the question of investment entirely to the good faith and sound judgment of the defendants. Their confidence in this respect was supreme and arose out of their ignorance as to where

and how to invest their savings and the utter faith they had in the integrity and business ability of Mr. I. H. Nakdimen. In many instances plaintiffs carried their trust to the extent of permitting the defendants to withdraw their savings and make investments without knowing that such action had been taken until they would receive notice from the bank in the form of a debit memorandum, or a check drawn by the bank on their funds made payable to itself to which their names were signed by some officer of the bank. In most instances they would know nothing of the nature or value of the securities and frequently would not see the bonds or notes purchased, but which would be retained by the bank for safe keeping. It is impracticable to recite the evidence in detail with respect to each of the plaintiffs. Suffice it to say that the defendants dealt with all of them practically in the manner above related. It would seem that their confidence was justified over a considerable period of time and that the bank, under the management and direction of Mr. Nakdimen, invested their money wisely and well.

Therefore, when the investments were made in the bonds of the East Oklahoma Publishing Company a condition had arisen wherein trust was reposed on the one hand and the utmost care and good faith required on the other. It is unquestioned that in most instances the savings of the plaintiffs were withdrawn without their knowledge to be used for the purchase of the East Oklahoma Publishing Company bonds. As to a few of the bonds purchased, and as to some of the plaintiffs, information was given in advance and advice as to the character of the bonds. But, in all cases, Mr. Nakdimen led the plaintiffs to believe that the security behind the bonds was ample and that such bonds were more valuable than ordinary investments because of the character of the assets securing them, the high rate of interest they bore, and their long maturities. It is apparent that plaintiffs relied upon the representations made regarding the publishing company bonds. The trial court has found that those representations were untrue, and with this finding we agree. This conclusion can be reached without any aspersion on the character of I. H. Nakdimen and with-

out questioning the honesty of his motives. Because of the fiduciary relation, the representations made, however honestly, and their untruthfulness establish legal fraud, it having been shown that plaintiffs relied wholly on these representations. It develops that Mr. I. H. Nakdimen was interested in the East Oklahoma Publishing Company and in its bonds, of which fact plaintiffs were ignorant, and when this and the relationship he bore plaintiffs are considered, he owed them more than ordinary care in making the investments, and defendants are in error in contending otherwise. There are a number of facts in connection with the organization of the East Oklahoma Publishing Company—the price paid for the value of the assets it possessed, Mr. Nakdimen's connection with the company, which it was his duty to disclose and he remained silent. This conduct amounted in law to fraudulent concealment notwithstanding the fact that Mr. Nakdimen might have been honestly mistaken as to the value of the investments and believed all the statements he made to the plaintiffs were true. *Hunt* v. *Davis,* 98 Ark. 44, 135 S. W. 458; *Grant* v. *Ledwidge,* 109 Ark. 297, 160 S. W. 200; *Held* v. *Munsur,* 181 Ark. 876, 28 S. W. (2d) 704.

Defendants insist that the bonds of the East Oklahoma Publishing Company were as represented. This is based largely on the contention that the company was not insolvent at the time of the issuance of the bonds, or since, and that this fact has been found by a district court of the state of Oklahoma which is conclusive on the plaintiffs on this question. The representations were such as would lead to the belief that the bonds would not only be paid with maturing interest, but were such as could be readily sold on the market for their face value. This was the character of bond plaintiffs thought they were buying. So, these representations might not be true even though the publishing company was not in fact insolvent, as we understand that term.

These facts are undisputed: The Sequoia Publishing Company, an Oklahoma corporation, owned and operated a number of newspapers in eastern Oklahoma. The East Oklahoma Publishing Company was organized with

a capital stock of $90,000, one-half of which was issued to I. H. Nakdimen and the remainder to Gould Moore and Chas. O. Frye, who were then the owners of the assets of the Sequoia company. Contemporaneous with the formation of the East Oklahoma Publishing Company the Sequoia company sold its assets to the East Oklahoma Publishing Company for $69,000. Immediately, upon the organization of the last-named company, it issued $75,000 of bonds secured by mortgage on the property it had recently acquired.

At the time of the organization of the East Oklahoma Publishing Company, Moore and Frye, acting under the direction of I. H. Nakdimen, made an inventory of the property conveyed by the Sequoia company. They were directed to, and did, make an inventory of all of the property even to the minutest articles, such as cuspidors and the like, at their values as if new. In fixing these values they used a current catalogue in which various articles going to make up newspaper plants were listed and priced. The inventory thus made placed a value on the real estate, consisting of two city lots, at $12,000. Then followed a list of the newspaper machinery, parts and office equipment as of a value as new. To this was added as an asset the item "legality." This item is explained by a witness as follows: "In order to be paid to publish legal publications, you have to issue the paper fifty-two consecutive weeks before you can accept them, and we place a value on that paper when it becomes of legal age." This legality value was listed as an asset in the sum of $25,644.44. The aforesaid items made a total sum of $154,855.56. An expert accountant who had been employed by the Sequoia Publishing Company for several years in preparing and making its income tax returns was directed by I. H. Nakdimen to make a set-up of the value of the assets of the new corporation and to fix the same at a figure which would justify the issuance of a $90,000 capital stock and a bond issue of $75,000. According to his judgment, to effect this purpose he found it necessary to swell the apparent value of the assets to a sum in excess of $4,000, which he did by increasing the item "legality" in the amount found to be necessary.

This accountant was acquainted with the original cost of the items which made up the property of the Sequoia Publishing Company and with its age and condition. These items were the same he was using in the new set-up. He acquired this information as to the original cost from the records of the company, which information was necessary to enable him to make up the income tax return. The $69,000 for which this property was sold was $18,800 in excess of its original cost and, while in good repair at the time of the sale, much of it was old and obsolete. There was never an appraisement of the property acquired by the East Oklahoma Publishing Company from the Sequoia company, but to justify the value shown by the inventory used as a basis for the issuance of capital stock and the bond issue, defendants contend that the net earnings of the newspapers for the years 1927 and 1928, when they were still the property of the Sequoia company, and for the year 1930—the first full year of their operation by the East Oklahoma company—was sufficient to justify the value as shown by the inventory. They further contend that this result follows from the finding of the district court in Oklahoma by its decree made and entered on the 27th day of June, 1933, to the effect that the East Oklahoma Publishing Company was a solvent and going concern. This decree of the Oklahoma court was rendered in a suit brought by E. N. King, J. A. and P. L. Riggs for the appointment of a receiver of the East Oklahoma Publishing Company. The proceedings in that case were introduced in evidence in the instant case by the defendants.

The contention as to the net earnings for the years 1927, 1928 and 1930 is based on the testimony of E. J. Mendel, who was the auditor of the Sequoia company for a time. At the time of the organization of the East Oklahoma Publishing Company, Charles O. Frye and Gould Moore were left in charge of the operation by I. H. Nakdimen. Within a short time Frye severed his connection with the management and Moore did likewise sometime in the spring of 1930 when Mendel was made general manager, and was such at the time he testified in the case.

Before discussing the testimony of Mendel it is proper to mention the following facts: Shortly after the organization of the East Oklahoma Publishing Company, or just before,—it is immaterial at which time—Moore and Frye had purchased other and additional newspaper plants than those owned by the Sequoia company at a cost of $51,500 and sold these to the East Oklahoma Publishing Company for that price. On or about November 29, 1929, the East Oklahoma Publishing Company made a second bond issue for $50,000, secured by a deed of trust or mortgage on the same real estate and property as were included in the first mortgage and three of the newspaper plants, which cost $31,500—one or more of the plants last acquired, costing $20,000, not being included in the mortgage securing the second bond issue.

It seems that the records of the Sequoia company were not available when the evidence in this case was developed, but Mendel testified that its real profit for the year ending December 31, 1927, was $14,811.96. This statement appears to have been based upon an audit of the Sequoia company's affairs made by Frambers & Company. With reference to the earnings of the company for the year 1928 up to October 1, there seems to be no record, but Mendel testified and introduced a table purporting to set up the earnings of the East Oklahoma company for the years 1929 and 1930 showing a net profit realized in excess of $28,500. From these figures defendants argue that the Sequoia company had an earning value of $246,000 based on a capital valuation, and that, therefore, its value amply justified the amount of the first bond issue and capital stock. There is evidence tending to show that in arriving at the figures above mentioned Mr. Mendel failed to take into consideration numerous items of overhead and operating expense, and that as a matter of fact, instead of there being a net earning for the year 1927, there was a deficit, and that for the last three months of the year 1928 the East Oklahoma Publishing Company operated at a loss. This evidence is found in the testimony of R. C. Frambers, who made the audit for the Sequoia company for the year 1927 and for the last three months of the year 1928. There is evidence

showing that in making up the table of the earnings of the East Oklahoma Publishing Company for the years 1929 and 1930 Mr. Mendel included earnings of certain newspapers for the year 1929, which, at that time, were not owned by the East Oklahoma Publishing Company, but had been acquired by Moore and Frye and sold to the East Oklahoma Publishing Company in the latter part of that year. This, together with Mr. Mendel's failure to take notice of the overhead, taxes and other items properly deductible from the gross earnings, justified the trial court in disregarding his testimony as to the net earnings. The conclusion of the court below as to his testimony is strengthened by the decision of the district court of Sequoia county, Oklahoma, in a suit brought by Riggs and King against the East Oklahoma Publishing Company seeking receivership which has been referred to, incidentally, above. That court found that the East Oklahoma Publishing Company operated at a loss for the years 1929, 1930 and 1931. The suit referred to was instituted in April, 1933, but Mr. I. H. Nakdimen was well acquainted with the situation before the filing of that suit and before the findings made by that court. On March 15, 1932, he addressed a registered letter to Mr. Frye in which he stated that it was necessary, in order to retire the bonds past due and the bond interest accrued, to assess the stockholders in proportion to their holdings in a total amount of $22,990, and in that connection stated: "* * * that the returns from the business (East Oklahoma Publishing Company) have been wholly inadequate to meet its obligations; in fact, there have been no profits at all, and, in view of this situation, the company has defaulted in meeting bond payments and interest."

The capital stock of the East Oklahoma Publishing Company, as noted, was $90,000. However, it is undisputed that nothing was paid by I. H. Nakdimen, C. O. Frye or Gould Moore for this stock and an assessment might have been made against the stockholders under the laws of the state of Oklahoma (§ 39, Art. 9, Const.; *Chilson* v. *Cavanaugh*, 61 Okla. 98, 160 Pac. 601, L. R. A. 1918D, 1044) and this be considered as an asset as secur-

ity for the payment of the bond indebtedness. This seems to have been the conclusion of the Oklahoma court, which would have been correct except for a provision in the bond and the trust indenture. . Both of these provided that no recourse upon any obligation contained in the indenture, or in any bond or coupon secured thereby, could be had against any past, present or future stockholder, director or officer of the company; that the obligations secured were solely corporate obligations. and no personal liability whatsoever should attach to any of the stockholders, directors or officers of the company; that all such liability, arising at common law or in equity, or to be created by statute, was expressly released and waived as a condition, and as part, of the consideration for the execution of the indenture and the issue of bond and interest obligations secured thereby.

Therefore, the only securities for the payment of the bonds were the tangible assets of the East Oklahoma Publishing Company. We are of the opinion that the trial court was correct in finding that the ''bonds were not such securities as a careful banker would in due course of business sell to his customers * * * and were not the kind of securities which I. H. Nakdimen assured plaintiffs their investments would be.''

As to the plaintiffs, E. N. King, J. A. and P. L. Riggs, the affirmative defense was made that they are precluded from maintaining an action for rescission of their contract by reason of the suit instituted by them in the district court of Sequoia county, Oklahoma, by which they made an election between existing inconsistent remedial rights, which constitutes a bar to their action for rescission. The further contention is made, as to all of the plaintiffs, that this suit is representative in character which constitutes an election, not only as to King and Riggs, themselves, but as to all the other bondholders.

On this phase of the case the trial court found that the remedy pursued in the Oklahoma court was not inconsistent with the one sought to be asserted in the instant case. In this we think the court was correct. The

suit in Oklahoma was not grounded on fraudulent representations inducing the bondholders to purchase the bonds, but was an action for the appointment of a receiver on the allegations of mismanagement, waste, nonpayment of taxes and insolvency. It is not shown that at that time King and Riggs knew the falseness of the values fixed by the inventory, or any other circumstances tending to indicate that the bonds when issued were not of the value represented. In the case decided by the Oklahoma court, the relief prayed was denied on the ground that the action was not warranted because of certain provisions in the trust indenture, and that the evidence failed to show the insolvency of the East Oklahoma Publishing Company, but did not pretend to be an adjudication on the questions presented in the case at bar. As previously noted, when the suit was instituted in the Oklahoma court, there is nothing to show that the bondholders were aware of the falsity of the representations regarding the value of the bonds at the time of issuance. Therefore, the case of *Craig* v. *Meriwether,* 84 Ark. 298, 105 S. W. 585, cited by plaintiffs, is controlling. "The binding force of an election cannot be predicated upon mere imputed knowledge, for the doctrine is based entirely upon the idea of a conscious exercise of choice between two remedies which are inconsistent with each other. In order that a person who is put to his election should be concluded by it, two things are necessary: first, a full knowledge of the nature of the inconsistent rights, and of the necessity of electing between them; second, an intention to elect, manifested either expressly or by acts which imply choice and acquiescence." Other cases are cited announcing the same doctrine.

■ In the argument for reversal, under grounds Nos. 10 and 15, defendants contend that plaintiffs are not enltitled to a rescission because of their having received interest on the bonds and because of their delay in instituting the instant proceedings and making no objection within a reasonable time to the state of their accounts as shown by their balanced bank books and returned vouchers, and, that their reliance on the repurchase agreement barred their right to rescission. A suf-

ficient answer to these contentions is that during the time plaintiffs were receiving the interest and having their bank books balanced, they were not informed as to the falsity of the representations regarding the value of the bonds, that the agreement to repurchase was a part of the fraudulent representations, and there is no question in this case of an account stated.

■ The most difficult question presented is that relating to the liability of defendant bank, argued under grounds for reversal Nos. 11, 13 and 14 by the appellant. It is insisted, under ground No. 13 that the bank was without power to enter into a valid repurchase agreement, or to act as a broker in purchasing or selling securities for another person. It is conceded by plaintiffs that the bank cannot be bound by its repurchase agreement, but can buy and sell "investment securities" such as those involved in the instant case. Prior to the act of Congress of February 25, 1927—"An Act to Further Amend the National Banking Laws and the Federal Reserve Act, and for Other Purposes"—the law seems to have been as contended for by the defendants. But the act noted extended the authority of national banks and authorized the buying and selling of investment securities "without recourse." United States Statutes at Large, Vol. 44, Part 2, Public Laws, chapter 191, § 2, page 1226. See 12 U. S. C. A., § 24. See, also, *Awotin* v. *Atlas Exchange National Bank of Chicago,* 295 U. S. 209, 55 S. Ct. 674, 79 L. Ed. 1303.

Grounds for reversal Nos. 11 and 14 relate to the relations between plaintiffs and defendants, I. H. Nakdimen and the bank, and as to whether the knowledge of I. H. Nakdimen should be imputed to said bank.

Ordinarily, the duties of the president of a bank and his authority are limited in their scope, but may be extended by special authority, or by the assumption of authority with long acquiescence by the bank in the course of action of its president, or by the existence of facts from which such authority may be implied. *First National Bank* v. *New,* 146 Ind. 411, 45 N. E. 597; *Bell* v. *Hanover National Bank,* 57 Fed. 821; *Smith* v. *Lawson,* 18 W. Va. 212, 41 Am. Rep. 688; *U. S. National Bank* v.

*First National Bank*, 79 Fed. 296. In such cases the bank is ·bound by the knowledge and representations of its president even though his authority be not actual, but only apparent. This doctrine is founded upon the general principles of agency which apply to banking corporations as well as the relation of principal and agent between individuals. The result is that a bank is liable for the acts of its agent done within the scope of his authority, real or apparent, and for his frauds and torts perpetrated in the performance of, or connected with, the business of his agency. 4 Michie on Banks & Banking, page 78, § 1. In the same volume and section the text has it: "The officers and agents of a bank are held out to the public as having authority to act according to the general usage, practice, and course of their business, and their acts within the scope of such usage, practice and course of business, will, in general, bind the bank in favor of third persons having no knowledge and charged with no notice to the contrary. The presumption is that they have been invested with all the authority customarily exercised by such officers and agents, and all their acts within the scope of such usage, practice, and course of business will bind the bank in favor of third persons having no knowledge to the contrary. And the fact that persons dealing with the bank preferred to deal with a particular officer does not make that officer their agent so as to permit the bank to escape liability for its acts. * * *

"Under some circumstances, the bank may be bound upon the acts and contracts of its agents even though they go beyond the usual and apparent scope of the duties ordinarily incident to the position, as where it has allowed a cashier or other officer to exercise a general authority for a considerable length of time in respect to the business of the bank which would not ordinarily come within the scope of his duties as such cashier or agent. * * *

"If the contract is within the authority of the officers, and would be valid and bind the bank under any circumstances, an innocent party has ·a right to presume the

existence of such circumstances, and the bank is estopped to deny them. This implies that those dealing with a bank in good faith have the right to presume not only the existence of the authority which would ordinarily be implied from a previous course of dealing and holding out, but integrity on the part of its officers when acting within the apparent sphere of their duties, and the bank is bound accordingly, there being nothing in the known state of affairs of the bank or his relations to it to excite suspicion.''

Even though the action of the president of a bank be unauthorized, if it results in benefit to the bank, after having accepted such benefit the bank cannot deny the authority of its president. *Bank of Shirley* v. *Smith*, 181 Ark. 243, 25 S. W. (2d) 440; *Wilson* v. *Davis*, 138 Ark. 111, 211 S. W. 152.

Applying these principles to the facts as found by the trial court which appear to have been sustained by the evidence, it necessarily follows that the decree holding I. H. Nakdimen, personally, and the defendant bank liable must be sustained. It is fairly inferable that for many years I. H. Nakdimen, with or without authority, assumed the position of sole managing officer of the bank and this assumption of authority upon his part was acquiesced in by said bank. It is clear that in the minds of plaintiffs he was ''the bank.'' It was to him they went on all matters of business and whatever he said and did the bank accepted without protest. His was the preponderating influence in the affairs of the bank; in fact, he appears to have dominated it.

The evidence is uncontradicted that I. H. Nakdimen also dominated the East Oklahoma Publishing Company, that he took exclusive charge of the bonds issued and used the defendant bank in their disposition. It is somewhat doubtful whether the bank purchased the bond issue in its entirety and sold the bonds to the investors. The testimony of H. S. Nakdimen, one of the officers of the bank and styled ''assistant to the president,'' is to the effect that the bank at no time owned the bonds or was connected with their sale; that this was an individual matter of I. H. Nakdimen, who, in these transactions,

acted for himself and as officer of the East Oklahoma Publishing Company. There are circumstances which dispute this testimony; first in a very limited time after both the first and second bond issues were made the bonds were all disposed of. Within three days after the date of the first bond issue $35,000 of the initial purchase price of the East Oklahoma Publishing Company was paid to Moore and Frye by the application of that amount to a debt due by them to the bank and the remainder paid to them in cash within five or six days. There is evidence that no commissions, as such, were charged or collected by the bank in handling the East Oklahoma Publishing Company bond issues, but there remained of the balance of the first bond issue, after the purchase price was paid, the sum of approximately $6,000. As to what became of this balance the record is silent, but it definitely appears from letters written by the officers of the bank, as such, that the bank in fact sold bonds of both the first and second issues direct to some of the plaintiffs. I. H. Nakdimen, in a letter to plaintiff, Mrs. J. A. McCann, enclosed a list of her investments, including bonds of the East Oklahoma Publishing Company, and stated: ''I herewith inclose copy of our ledger sheet showing all the transactions and investments that this bank has handled for you since you have been with us.'' Later, Mr. R. H. Kagy, vice-president and cashier, sent a list of investments, including East Oklahoma Publishing Company bonds, together with other bonds, to Mrs. McCann, and in his letter stated: ''Our records show that the following investments were purchased by you from us on the following dates.'' Still later, in regard to other investments, Mrs. McCann was advised, by letter signed by the president. of the collection of certain notes and their reinvestment in certain other securities.

One of the plaintiffs, Mrs. W. T. Moore, who, at the time of the issue and sale of the East Oklahoma Publishing Company bonds, was a nonresident, but who formerly resided in Fort Smith and did, and continued to do, business with defendant bank, received a letter from the bank on October 3, 1929, signed by its vice-president and

cashier, advising that her list of securities held by the bank totaled $12,000, certain of which bore five and six per cent. interest and were short maturities. This letter further advised that if she so desired, "we will be in a position in a day or so to let you have some long maturities and at a seven per cent. rate." She replied indicating her willingness to the exchange for the bonds drawing seven per cent., and said: "I know the securities are as good or you would not recommend the change." (The short maturity securities were good and amply secured.) Following the receipt of this letter the bank advised Mrs. Moore of the purchase of the short maturity securities for which it gave her credit and charged her account with approximately $9,000 for bonds of the East Oklahoma Publishing Company. Many of the checks were drawn by the bank itself, signed with the customer's name, drawn on and made payable to the bank, the first information of such customers being when they received a debit item showing the transaction.

We think these circumstances are sufficient to justify the conclusion reached by the trial court that the bonds were placed upon the market by the bank which began selling them to its customers immediately after their issue.

It is difficult to distinguish between the relation of I. H. Nakdimen and that of the bank in regard to the disposition of the bonds, but their connection is such that the trial court was justified in finding that the bank and Nakdimen were so related as to make the former bound by the latter's knowledge of the affairs of the East Oklahoma Publishing Company, and that plaintiffs were not informed of the bank's interest in these bonds or Nakdimen's interest in the East Oklahoma Publishing Company, and that his representations must be deemed to have been the representations of the bank. Taking all the circumstances into consideration which are disclosed by the record, I. H. Nakdimen, with respect to the transactions involved, was acting within the scope of his apparent authority, and his interest was not inconsistent with that of the bank.

Moreover, an application of the principles announced by this court in the cases of *Bank of Shirley* v. *Smith* and *Wilson* v. *Davis, supra,* bind the defendant bank in this case even though it was not otherwise liable. At the time of the organization of the East Oklahoma Publishing Company, Frye and Moore, the owners of the Sequoia Publishing Company, owed the defendant bank a debt of $35,000. This was unsecured. Out of the first bond issue the bank benefited to the extent of this debt. It is argued that no showing is made that Moore and Frye were insolvent or that the debt was of doubtful value. Subsequent events, however, disclosed that the bank made a good business stroke in collecting this debt when it did. Between the first and second bond issues, the East Oklahoma Publishing Company became indebted to the bank in the sum of $14,500 and out of the last-named bond issue the bank obtained the payment of that sum. This appears, also, to have been "good business," for since then the East Oklahoma Publishing Company has contracted another debt with the bank, which, from the record before us, seems to be of doubtful value.

It frequently happens that the interest of an officer and that of his bank may be independent of each other, but not necessarily adverse, so as to counter the presumption that his knowledge is its knowledge. The counter presumption should be enforced to protect the corporation where the interest of its officer is adverse, but should not be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibility. *J. J. McCaskill Co.* v. *U. S.*, 216 U. S. 504, 30 S. Ct. 386, 54 L. Ed. 590. And, where the interests are adverse rather than independent, the court, in *Curtis Collins & Holbrook Co.* v. *U. S.*, 262 U. S. 215, 43 S. Ct. 570, 67 L. Ed. 956, said: "The adverse interest as between them in sharing the fruits of the common business cannot enable the company to retain its share and repudiate the agent with all he knew." In this connection we notice the argument of defendants, under head No. 16 of their brief—that the act of the bank directors in loaning the East Oklahoma Publishing Company $25,000 to buy securities is the strongest evidence that

no false representations were made by I. H. Nakdimen. We fail to discover any resolution of the board of directors of the bank, or action taken by it, in loaning this money to the publishing company. It is doubtless true, as argued, that I. H. Nakdimen believed, at the time of the issuance of the bonds, that the East Oklahoma Publishing Company was solvent. We suspect that this belief was engendered largely by his supreme belief that his connection with, and direction of, the affairs of the publishing company would be such an asset as to render it a solvent and going concern and not by the actual value of its tangible assets. Unfortunately, however, even the genius of Mr. Nakdimen could not accomplish that result and it may have been that the $25,000 loan to the East Oklahoma Publishing Company was prompted, not so much because the loan was thought to be good, but rather to prop the tottering structure of the publishing company to the maintenance of which defendants were committed.

## Cross Appeal

With relation to the Methodist church bonds, the trial court found that the bank had a contract to dispose of $37,000 of a $55,000 bond issue of said church for which it was to, and did, receive a commission of $7,070; that the bank, at the time of carrying out said contract, advanced the full amount of $37,000 to the said church less loans previously made and less the commission; that under the contract the bank was obligated to find customers for said $37,000; that it had a waiting list among its customers for securities it had for sale and immediately disposed of these bonds to its customers.

With relation to the Sharp notes, the trial court found that the bank received a commission of $600 from Sharp for which it agreed to dispose of $10,000 of his notes, secured by a mortgage on a farm; that these notes were sold to the customers of the bank and, before all of them were disposed of, the bank remitted to Sharp $9,400 as the net proceeds of its loan. The trial court further found that plaintiffs were not informed, and did not know, that the defendant bank was charging and receiv-

ing a commission on the sale of the Methodist church bonds and the Sharp notes, and, as a matter of law, found that plaintiffs were not entitled to recover on said bonds and notes.

The cross-appeal is prosecuted on the dual agency doctrine as announced by the text writers and a number of state and federal courts. This doctrine, briefly stated, is that an agent may represent both parties to a transaction with their knowledge and consent, but without such knowledge and consent, an agent's contracts relating to the transaction between his principals are voidable at the instance of either who may feel aggrieved—and this, even though the principals were not in fact injured, or the agent intended no wrong, or the other party acted in good faith. The double agency is of itself in law a fraud on the principal and he is not bound. 2 C. J., 838; *Olson* v. *Pettibone,* 168 Minn. 414, 210 N. W. 149, 48 A. L. R. 913; *Carr* v. *National Bank & Loan Company,* 167 N. Y. 375, 60 N. E. 649, 82 Am. St. Rep. 725. It is the contention of plaintiffs, cross-appellants, that the relation of dual agency existed which is denied by the defendants, and it is insisted by them that the principles stated have no application to the facts established by the record. In examining these contentions, we find but little evidence shedding light upon them. That we have been able to find, however, leads us to the conclusion that the trial court was correct in its declaration of law and in its decree absolving defendants from liability. Apparently, it was the intention of the original contract between the bank and the church that a commission of $7,070 should be charged and that the bank should sell the $37,-000 worth of bonds. The manner in which the transaction was actually handled, however, amounted to a purchase by the bank of the $37,000 of bonds at a discount equal to the proposed commission for their sale.

As to the Sharp notes, in considering whatever evidence appears, we think it deducible that what actually occurred was that the money was loaned to Sharp at a $600 discount and the bank became the owner of the notes and was such at the time of their sale to cross-appellants, as was also the case with respect to the

church bonds. H. S. Nakdimen so testified, stating in effect that these securities were carried on the books of the bank as assets and sold by the bank as owner and not as the agent of the church or of Sharp. We find no evidence to the contrary.

The cross-appellants contend, however, that the defendant bank could not change its contract of agency with the church and Sharp to that of purchase, and cites 2 Amer. Jur., pp. 254 and 255, in support of their position. The statement of the law in effect is that an agent cannot, if employed to sell, become the purchaser without the knowledge and consent of the principal; nor can an agent employed to buy become the seller unless with such knowledge and consent—that is to say, the agent cannot unite his personal and representative character in the same transaction, nor can he occupy the inconsistent position of buyer and seller, or principal and agent, in the same transaction. We think this principle has no application here, first, because it is nowhere shown by direct proof or circumstance that the action of the bank was without the knowledge and consent of the principal, and, second, the principals are not complaining.

The allegations first relied on for a rescission of the sale and purchase of the church bonds and Sharp notes were that the values were misrepresented and securities inadequate to the extent that the value of the bonds was not as represented. Without discussing the evidence in detail, we think its preponderance is to the effect that, at the time of the sale of the bonds and notes to the cross-appellants, the defendant bank was diligent in determining the value of the securities and acted only after the exercise of due care and circumspection. Furthermore, the weight of the evidence shows that the bonds and notes, at the time of issuance, were amply secured and worth their face value, and that in all probability they now are

It may be, we have overlooked and failed to discuss some matters in evidence and some of the contentions made by the parties to this litigation. This may be expected when the immensity of the record is considered and when the evidence is presented to us in the respective briefs of counsel in a fragmentary way. However, we

990

are not unmindful of the material matters in evidence and have endeavored to state the facts which seemed to be of controlling importance. Neither have we failed to examine the authorities cited, but to present .these and point out such features as distinguish some of the cases cited from the case at bar would be a task unproductive of value and only serve to further extend this opinion which is now too long. We think it sufficient to say, we find no case which, under a similar state of facts, conflicts with the principles herein expressed.

Affirmed on direct and cross-appeal.

Justices SMITH, HUMPHREYS and McHANEY dissent from so much of the opinion as holds the bank liable.