359 So.2d 1376 (1978)
FIRST AMERICAN NATIONAL BANK OF IUKA
v.
Woodrow G. MITCHELL, Jr., et al.
No. 50238.
Supreme Court of Mississippi.
May 31, 1978.
Rehearing Denied July 12, 1978.
*1377 Aultman, Pope, Aultman & Tyner, Thomas W. Tyner, Hattiesburg, Wynn & Bogen, Greenville, for appellant.
Price & Krohn, James E. Price, Corinth, for appellees.
Before SMITH, SUGG and BROOM, JJ.
BROOM, Justice, for the Court:
Fraudulent acts of Clint Reed, Vice President of appellant, First American National Bank of Iuka (FANB herein) in forcing appellees, Woodrow G. Mitchell, Jr., Arthur Hugh Mitchell, Billy L. Rider, Mayme Ella Mitchell, Patsy Bonita Mitchell, and James Ronald Mitchell (Mitchells herein), under threat of foreclosure, to sell a 317-acre farm to a purchaser selected by Reed were the foundation of the Mitchells' tort action against FANB. Trial in the Circuit Court of Alcorn County resulted in a jury verdict and judgment against FANB (in favor of Mitchells) for $100,000 actual and $250,000 punitive damages. We affirm as to liability.
On May 23, 1973, the plaintiffs Arthur Hugh and Woodrow G. Mitchell, Jr., borrowed $69,000 (evidenced by a note) from FANB. The Mitchells, along with several members of their family who had an interest in the property, executed a deed of trust (subordinate to one of record in favor of another lender) on their two farms as security for the note having a due date of May 24, 1974. Reed, Vice President of FANB and manager of its Corinth branch, was the officer who dealt with the Mitchells and closed their loan. Shortly afterward, another of the bank's officers, Mr. J.P. Yeargain, Vice President and Cashier, altered the due date on the note to November 15, 1973, which the Mitchells claim was done without their consent. Contrary to the policy of FANB, Reed had not submitted the loan matter to the loan committee.
The Mitchells claim that Reed had agreed to give them ten years to pay off the loan. After making their first payment of about *1378 $5400 in November 1973, the Mitchells were called in early in 1974 by Reed who said FANB's loan limit had dropped. Although their loan exceeded the limit by an average of only about $12,000, Reed told them they would have to pay their loan down to around $30,000. Reed did this in spite of the fact, testified to by Mr. Yeargain, that FANB's loan committee had not told him to do so. The Mitchells unsuccessfully attempted to refinance the loan. Reed then told them they would have to sell part of the property or FANB would foreclose. He also said he had a friend who might be interested in buying one of their farms for $300 an acre. They thought that price was too low, and against their desires attempted to sell the property on their own to prevent foreclosure.
About thirty to sixty days before they made the sale on which this suit is based, they talked to FANB's president, Dr. Kelly Segars, about what Mr. Reed was doing. Dr. Segars stated that he was not familiar with the loan but if Reed said it had to be done, then they would have to do it. They eventually began to talk to a Dr. Kay, who made several offers that were matched by Reed's "friend." Dr. Kay and Gene McFall, his partner, finally offered the Mitchells $187,000 and a two acre lot worth about $5,000. Reed's "friend" agreed to match that offer, and the Mitchells decided to sell. The two Mitchell brothers who ran the farm then followed Reed to Attorney Mathis' office and signed the deed to Reese Senter; only Reed and Mathis' secretary were present (the other Mitchells had already signed the deed). At Mathis' office they saw a check signed by Reese Senter for $192,000, which he later denied signing. Mathis then disbursed the funds, paying off the various lienholders from the proceeds of the sale to Simmons (grantee of Senter). The Mitchells paid an additional $10,000 of what remained after the disbursements purportedly to have their property released as collateral by FANB (FANB was not yet fully paid).
Three days before the Mitchells sold the property to Senter on April 26, 1974, unknown to the Mitchells, a James G. Simmons (as arranged by Reed) on April 23 had already executed a contract to purchase the property from Reese Senter. Simmons left his $1,000 earnest money check with Reed. On April 26, Senter deeded the property to Simmons for $221,900. The $34,650 difference in what the property was purchased for and sold for was divided between Senter and Don Kirk, but the record is not clear as to exactly what happened to all of it once they received it; disbursements for and to the Mitchells added up to only approximately $187,000. About the time suit was filed, Senter filed an amended income tax return adding his share in this sale. Conspiratorial aspects saturate the whole transaction arranged by Reed with Kirk coordinating the different participating individuals. Mysteriously, Simmons never met Senter or the Mitchells.
FANB assigns eighteen errors. The only propositions which merit discussion are basically the assertions that (1) because of waiver, the Mitchells are precluded from recovery against FANB; (2) FANB breached no duty owed to the Mitchells; (3) the misrepresentations and fraudulent activity occurred outside the scope and course of Reed's employment; (4) the jury was not properly instructed; and (5) the damages were excessive.
We find no merit to the argument of FANB that the Mitchells by executing a revision agreement on November 25, 1974, which extended their note to November 15, 1975, thereby waived their right of action against FANB. Reliance upon Citizens National Bank v. Waltman, 344 So.2d 725 (Miss. 1977) is misplaced because that case and others relied upon are factually distinguishable from the instant case.
The general law is that under the proper circumstances a bank may be liable for the fraudulent acts, assertions, or misrepresentations of its officers which cause injury to the bank's customer. This liability is limited to acts and representations *1379 made by the officer within the scope of his actual or apparent authority when they are proved to have been relied upon to the detriment of the plaintiff. We hold here upon the facts presented that a bank is liable for the fraudulent acts of its officer or agent who, acting within the apparent scope of his authority, induces a debtor (mortgagor) of the bank to enter into a transaction with a third person, or with the officer or agent personally, whereby the debtor is defrauded and damaged.
This jurisdiction apparently has no case law specifically addressing the facts of this case, but Grenada Bank v. Moore, 131 Miss. 339, 95 So. 449 (1923) is pertinent. There a bank customer deposited certain bonds with the bank's Ackerman branch through its branch manager who wrongfully hypothecated the bonds and borrowed large amounts of money on them. The administrators of the customer's estate sued to recover the bonds and this Court allowed recovery and stated:
The act of the manager, Torbert, in converting the bonds to his own use, was, in effect, the act of the bank itself. (131 Miss. at 342, 95 So. at 450).
Also, Billups Petroleum Co. v. Hardin's Bakeries Corp., 217 Miss. 24, 63 So.2d 543 (1953), held Hardin's responsible for loss due to the fraud of one of Hardin's route salesmen.
Several foreign jurisdictions have imposed liability upon banks for fraud perpetrated by bank officers. The one distinguishing point in most of these cases is that the courts generally found a fiduciary relationship between the bank and its customer(s) based on past dealing and the plaintiffs' reliance upon the bank's advice, which apparently were not present in the case sub judice. The facts in Rutherford v. Rideout Bank, 11 Cal.2d 479, 80 P.2d 978 (1938), a California decision, are almost identical to the present one. In Rutherford a branch manager told Mrs. Rutherford, the plaintiff, that she should sell her ranch to Finnie, even for $5 an acre because, if she didn't, the owner of the deed of trust would foreclose on it and his bank would foreclose on her "Home Place," causing her to lose everything. She then sold it to Finnie for $23 an acre when the reasonable market price was $30 an acre. Later, after discovering evidence that Finnie had bribed the manager, she successfully sued the bank for damages. The California Court in its opinion stated:
That it was within Taylor's duties as manager of that branch of the bank to discuss with its debtors the action which the bank proposed to take with respect to sums owed it and encumbrances securing such sums is clear... . [I]t was also within the line of his duties to discuss generally with debtors the condition of the business in which, as a creditor, the bank had an interest and the measures which the bank would approve as tending to protect its security. (11 Cal.2d at 483, 80 P.2d at 980).
In City Nat'l Bank v. McCann, 193 Ark. 967, 106 S.W.2d 195 (1937), the Arkansas Court reached a similar result. There a bank president sold bonds of a company (in which he was interested) to some of the bank's depositors as a "safe investment," which was not true. The trial court found a fiduciary relationship existed and decided for the plaintiffs. In affirming on appeal, the court stated:
It frequently happens that the interest of an officer and that of his bank may be independent of each other, but not necessarily adverse so as to counter the presumption that his knowledge is its knowledge. The counter presumption should be enforced to protect the corporation where the interest of its officer is adverse, but should not be carried so far as to enable the corporation to become a means of fraud or a means to evade its responsibility. (193 Ark. at 986, 106 S.W.2d at 205). (Emphasis added).
The present case of the Mitchells is just such a case. Although Reed's interest is in a sense independent of FANB's, at the *1380 same time it cannot be said to be adverse because FANB was able to substantially reduce what it considered to be an unfavorable loan. Cases cited by FANB on leaving a master's business are not applicable because at all times in the instant case Reed appears to the Mitchells to be looking out for the bank's interest. The dispositive question as to liability of the bank is: Did FANB, under these circumstances, owe a duty to the Mitchells to disclose the higher price available for their farm? Our answer is: Yes.
FANB and the Mitchells argue two inconsistent theories on the issue of the duty of FANB or its officer (Reed) to tell the Mitchells that a higher price was available. FANB argues (1) that this Court should apply the bank-customer relationship in which FANB doesn't owe any duty of full disclosure to the customer, and (2) that it and the Mitchells are two parties with adverse interests, the same as any two parties to a business transaction. The Mitchells, on the other hand, argue that the applicable relationship is that of mortgagor-mortgagee in which the mortgagee (FANB) not only owes a duty to the mortgagor (Mitchells) to advise them that a higher price is available, but has the duty to make reasonable efforts to obtain the highest price available.
The relationship which FANB advances is that of a bank and its depositor, which generally is not a confidential or fiduciary one. In this instance, a loan has already been closed and the mortgagor-mortgagee relationship exists. Under our case law the mortgagor and mortgagee are in a relationship of trust, and the mortgagee should not be allowed to abuse that relationship as happened in the present case. Federal Land Bank v. Collom, 201 Miss. 266, 28 So.2d 126 (1946); Meyers v. American Oil Co., 192 Miss. 180, 5 So.2d 218 (1941). Even though the relationship of the Mitchells to FANB was adverse so far as payment of the debt was concerned, FANB was under a duty to disclose the facts peculiarly within its knowledge, i.e., the facts pertaining to the sale of the land for $221,900.
FANB cites Stewart v. Phoenix Nat'l Bank, 49 Ariz. 34, 64 P.2d 101 (1937), for the proposition that a bank owes no duty of full disclosure to a depositor (here the Mitchells are not mere depositors). However, the Arizona court goes on to find that there may be a fiduciary relationship between the bank and its mortgagor due to the character of a bank and their giving of financial advice over the years. The court there accurately notes that banks are seeking people's trust and confidence and therefore may owe clients a high degree of care. We hold here that FANB at least owed its mortgagors, the Mitchells, a duty of fairness which it violated. FANB through Reed had knowledge that the property which the Mitchells were induced to sell for $187,000 could be sold for much more. FANB's duty of fairness carried with it the duty to disclose that the land could be sold for $221,900. Breach of this duty by FANB operated to defraud the Mitchells of approximately $35,000, and to that extent FANB is liable. See Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909).
FANB argues error in the granting and rejection of several jury instructions, and contends that instruction D 1 should have been given. This instruction does not correctly state the law in these circumstances because, even though Clint Reed was acting in his interest, he was within his apparent scope of authority in taking the actions which he took, at least as to the discussions about the loan. FANB also claims that the jury was not properly instructed that to be liable for Clint Reed's actions, his actions must have been made within the course and scope of his employment; although this was not pointed out in every instruction (as it should have been), the jurors were instructed as to this in plaintiff's instruction number 1 and defendant's instruction number 2. As to Mitchells' *1381 instructions on punitive damages, FANB points out correctly that instructions P 3 and P 4 failed to include language that Reed's acts must have been proven to have been within the course and scope of his employment. While such language should have been included in P 3 and P 4, inasmuch as other instructions contained similar language, the defect is not reversible error because under our rule all instructions are to be read and considered as a whole.
FANB persuasively contends that both the actual and punitive damages awarded were grossly excessive. $100,000 actual damages were awarded  approximately three times the $35,000 proved by specific evidence. The evidence as to interest cost incurred by the Mitchells due to their loss could have been proven specifically but was not. Furthermore, there was no proof as to loss of credit rating other than the testimony of the two Mitchell brothers that they had trouble getting credit, and this is in the face of their testimony that they have negotiated several loans since the time of the sale of their property.
Although punitive damages may properly be awarded against FANB due to the fraudulent acts of its officer or agent, $250,000 is so grossly excessive that the amount is shocking. Not only is the record deficient and unclear as to proof of actual damages above $35,000, no proffer was made of adequate proof of the net worth or financial condition of FANB. Snowden v. Osborne, 269 So.2d 858 (Miss. 1972). Absent some proper showing of the net worth or financial condition of FANB, we have no way to measure the correctness of the punitive damage award ($250,000) which on its face seems totally unrealistic upon the record. Accordingly, remand is necessary for retrial on the sole issue of damages: actual and punitive.
AFFIRMED AS TO LIABILITY; REVERSED AND REMANDED FOR RETRIAL OF DAMAGES ONLY.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.