IN THE SUPREME COURT OF MISSISSIPPI
NO. 91-CA-00615-SCT

*MERCHANTS & PLANTERS BANK OF RAYMOND
AND H.R. "DICK" KILBY, JR.*

*v.*

*CAROLYN JOSEPHINE WILLIAMSON*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 5/31/91 |
| TRIAL JUDGE: | HON. PAT WISE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DONNA JACOBS |
| | W. WAYNE DRINKWATER, JR. |
| ATTORNEYS FOR APPELLEE: | DALE HUBBARD |
| | KARLA J. PIERCE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 3/13/97 |
| MOTION FOR REHEARING FILED: | 1/26/95 |
| MANDATE ISSUED: | 3/20/97 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. We grant the motion for rehearing. The original opinion in this case is withdrawn and these opinions are substituted therefor.

## I. INTRODUCTION

¶2. Carolyn Williamson filed suit against Merchants & Planters Bank of Raymond, Mississippi and its president, H.R. Kilby, in the Chancery Court of the Second Judicial District of Hinds County alleging**,** *inter alia***,** that the Bank and Kilby breached a fiduciary duty owed to Williamson by refusing to accept her tender of the entire amount of her indebtedness to the Bank arising from a promissory note and by assigning the note and deed of trust to Robert and Shirley Hamilton. The chancellor found that the defendants breached fiduciary duties owed to Williamson and that the Bank had tortiously interfered with the contractual relationship between Williamson and the Hamiltons.

¶3. This Court concludes that the mortgagor/mortgagee relationship between Williamson and the Bank is not, as a matter of law, a fiduciary one and that the record does not offer substantial evidence to support a finding that a fiduciary relationship arose under the facts of the present case. This Court also concludes that the chancellor was in error as a matter of law in finding that the Bank had intentionally interfered with the contractual relationship between Williamson and the Hamiltons. Accordingly, we reverse.

## II. STATEMENT OF THE CASE

¶4. On September 19, 1989, Carolyn Williamson filed a complaint in the Chancery Court of the Second Judicial District of Hinds County, alleging numerous instances of wrongdoing on the part of Merchants & Planters Bank of Raymond (hereinafter "the Bank"), as well as on the part of Robert and Shirley Hamilton. Williamson alleged that the defendants: (1) deprived her of five parcels of land located in Hinds County; (2) the Bank breached a fiduciary duty which, she asserts, was owed to her by the Bank (3) breached the implied covenant of good faith and fair dealing; (4) negligently and intentionally inflicted emotional distress upon her and (5) intentionally interfered with her contractual rights. On June 11, 1990, Williamson voluntarily dismissed with prejudice all claims against Robert and Shirley Hamilton, but later added H.R. "Dick" Kilby, Jr., the Bank's president, as a party to the suit.

¶5. The chancellor ruled that the Bank had breached fiduciary duties owed to Williamson on three separate occasions and that the same conduct constituted a breach of the implied covenant of good faith and fair dealing. The chancellor further found that the defendants had tortiously interfered with Williamson's contractual rights in a lease/purchase agreement previously made with the Hamiltons. The court awarded Williamson $64,477.71 in damages, prejudgment interest at the rate of 10% per annum from March 11, 1986, partial attorneys' fees in the amount of $11,000 and all court costs.

## III. STATEMENT OF THE FACTS

¶6. On December 20, 1983, Tom and Carolyn Williamson, husband and wife at the time, entered into a lease/purchase agreement with Robert and Shirley Hamilton, which agreement provided for the lease of five parcels of land in Hinds County to the Hamiltons. Said agreement provided for a lease term of thirty (30) years or for such a period of time until the entire purchase price of $80,000 was paid. The purchase price was to be paid as follows: "$3,000 at the time of executing this lease agreement; payment of $200 a month beginning Jan[uary] 10, 1984 for two years. At the end of two years the monthly [payment] will be negotiated within [sic] terms suitable to both parties."

¶7. The agreement also provided that, if the purchasers did not make the payments as imposed by the terms of the agreement, "the parties will negotiate to reimburse the purchaser with monies or exchange of property in proportion to the amount the purchasers have paid toward this indebtedness." Pursuant to the agreement, the Hamiltons paid the Williamsons $3,000 in lease payments, leaving a balance due of $77,000 plus ten percent (10%) interest. On September 20, 1984, the Williamsons jointly executed a promissory note for $12,522.29 in favor of the Bank. This note renewed a prior debt the Williamsons owed to the Bank and was secured by a deed of trust covering the five parcels of land that were the subject of the lease/purchase agreement. Subsequent to the execution of the note, the Williamsons moved to Texas, and, shortly thereafter, they separated. Tom

remained in Texas, and Carolyn returned to Jackson, Mississippi.

¶8. Upon Carolyn's return to Mississippi, she notified Kilby, the Bank president, of her marital situation. She requested that the Bank keep her informed regarding the status of their loan to the Bank since, at that time, her estranged husband was making the payments. Kilby refused to send separate notices to Tom and Carolyn regarding the status of their loan, but assured her that she would be notified if payments were not made. Carolyn's relationship with the Hamiltons became increasingly hostile. Tom Williamson telephoned Robert Hamilton and informed him, for the first time, about the existence of the deed of trust in favor of the Bank. Robert Hamilton understood from his telephone conversation that Tom Williamson did not intend to make any more payments on the note. Concerned that foreclosure of the deed of trust might jeopardize his interest in the property via the lease/purchase agreement, Hamilton contacted and met with Kilby on December 20, 1985, about purchasing the Williamsons' note and deed of trust. At this time, the Williamsons were only one month in arrears, and the Bank had made no effort to notify Carolyn Williamson.

¶9. On February 28, 1986, the Bank entered into an agreement with the Hamiltons to assign the Williamsons' note and deed of trust for $8,617.26, the outstanding balance on the Williamson note to the Bank. In so doing, the Bank loaned the Hamiltons the pay off amount, and the Hamiltons executed a promissory note in favor of the Bank for the principal amount of $8,617.26 and granted the Bank a security interest in their homestead. In essence, the Bank substituted the Hamiltons' indebtedness for the Williamsons', and Carolyn Williamson was initially not made aware of this transaction.

¶10. On March 3, 1986, Carolyn Williamson telephoned Kilby and inquired about the status of their Bank note. At this time, Kilby informed Williamson about its assignment agreement with the Hamiltons. Kilby testified that, for the first time, Carolyn informed him of her differences with the Hamiltons. On March 4, 1986, the Bank mailed a certified letter to Tom and Carolyn Williamson, with copies to Carolyn Williamson's attorney and to the Hamiltons, advising them of the assignment agreement. This letter, which was sent only to the Texas address, stated that the assignment would be postponed until March 11, 1986, and that, unless "the debt is relinquished prior to that date, the Bank will proceed with its plan to assign its note and deed of trust to Mr. and Mrs. Hamilton."

¶11. Having learned of the postponement of the assignment, Carolyn Williamson sought help from her aunt, Wilmer Champion. On March 10, 1986, Champion obtained from Trustmark National Bank a cashier's check, payable to Merchant and Planters Bank, in the amount of $8,617.26. Champion then telephoned Kilby and informed him of her desire to help Carolyn. Kilby testified that at no time did Carolyn or Champion inform him that they wanted to "pay off" the note, but stated rather that Champion told him that she wanted to "buy" the note. According to Kilby, he advised Champion there was no guarantee that if she *paid* the note, her money would be protected. Kilby also testified that he informed Champion that the Bank could not *sell* the note to her since the Bank had a prior assignment agreement with the Hamiltons.

¶12. According to the women's version of the story, Kilby told them not to bring the check to the Bank because he had already agreed to assign the note to the Hamiltons. Altogether, Carolyn and Champion conversed with Kilby no less than four times on that particular date, and at all times, their offer was rejected. During all of these telephone conversations, Kilby never advised Carolyn or

Champion of the legal difference between "buying" and "paying off" a note, nor did he offer to accept the check as a pay off of the indebtedness. At 3:45 p.m. on March 11, 1986, when the Bank recorded the assignment, the Hamiltons became the new owners of the indebtedness. However, neither Tom nor Carolyn Williamson made any payments on this debt to the Hamiltons and, the Hamiltons foreclosed on the deed of trust. On May 28, 1986, the Hamiltons purchased four of the five parcels for $13,553, and Williamson was allowed to keep the fifth parcel of property.

## IV. STANDARD OF REVIEW

¶**13.** The standard of review which governs this appeal is well known; that is, this Court will not disturb a chancellor's findings "unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Tinnin v. First United Bank of Mississippi***,** 570 So. 2d 1193, 1194 (Miss. 1990). **See** *Bell v. Parker***,** 563 So. 2d 594, 596-97 (Miss. 1990). If a chancellor's findings are supported by substantial, credible evidence, this Court will not reverse. *Branton v. Branton***,** 559 So. 2d 1038, 1042 (Miss. 1990). With regard to issues of fact as to which the chancellor did not make a specific finding, this Court is required to assume that the chancellor resolved all such factual issues in favor of the appellee. *Bryant v. Cameron***,** 473 So. 2d 174, 179 (Miss. 1985).

## V. DISCUSSION OF LAW

### I. Did a fiduciary relationship existed between the Bank and Williamson and, if such relationship did exist, whether the actions of the Bank and Kilby in assigning the note and deed of trust violated any fiduciary duty owed to Williamson?

¶14. The chancellor held that a fiduciary relationship existed between the Bank and Carolyn and that the Bank breached said fiduciary duty. The existence of a fiduciary duty must be established before a breach of that duty can arise. *Lowery v. Guaranty Bank and Trust Co***.,** 592 So. 2d 79, 83 (Miss. 1991). A fiduciary relationship may be formed in a legal context where there emerges "on the one side an overmastering influence or, in the other, weakness, dependence, or trust, justifiably reposed." *Miner v. Bertasi***,** 530 So. 2d 168, 170 (Miss. 1988). **See** *First United Bank of Poplarville v. Reid***,** 612 So. 2d 1131, 1138 (Miss. 1992).

¶15. In *First American Nat. Bank of Iuka v. Mitchell*, 359 So.2d 1378 (Miss. 1978)[(1)], this Court noted that:

> The relationship which FANB advances is that of a bank and its depositor, which generally is not a confidential or fiduciary one. In this instance, a loan has already been closed and the mortgagor-mortgagee relationship exists. Under our case law the mortgagor and mortgagee are in a relationship of trust, and the mortgagee should not be allowed to abuse that relationship as happened in the present case. (citations omitted). Even though the relationship of the Mitchells to FANB was adverse so far as payment of the debt was concerned, FANB was under a duty to disclose the facts peculiarly within its knowledge.

*Mitchell* 359 So.2d at 1380. Thus, this Court stated in *Mitchell* that the relationship between a bank and its depositor is generally not a fiduciary one, but that the mortgagor/mortgagee relationship is

generally one of "trust" and that the mortgagee should not be permitted to abuse said trust. This Court has not explicitly held, however, that a fiduciary relationship exists as a matter of law between a mortgagor and mortgagee.

¶16. There is precedent, however, for the proposition that the relationship between a debtor and creditor may rise to the level of fiduciary based on the particular facts of the case. In *Lowery v. Guaranty Bank and Trust Co.*, 592 So.2d 79 (Miss. 1991), this Court held that a fiduciary relationship between the bank and a consumer/borrower may be established on a number of bases, including contract, agency, or the placing of trust and confidence in the bank. This Court in *Lowery* discussed case law applicable to credit life insurance policies and noted that:

> Though these cases deal primarily with procuring insurance, they illustrate that the facts and circumstances surrounding a transaction can create at least a quasi-fiduciary relationship between a lender and a customer. The determination of what constitutes a confidential or fiduciary relationship is a question of fact. (citation omitted).

*Lowery*, 592 So.2d at 84-85. Thus, this Court in *Lowery* held that at least a "quasi-fiduciary" relationship between a lender and a borrower may be established in certain situations and further held that the question of whether such a relationship was created is a fact issue.

¶17. Williamson distinguishes *Lowery* based on the fact that the present case involves a mortgagor/mortgagee relationship rather than a general debtor-creditor relationship and argues that a fiduciary relationship exists as a matter of law between the mortgagor and mortgagee based on the earlier *Mitchell* and *Federal Land Bank v. Collom*, 201 Miss. 266, 28 So.2d 126 (Miss. 1946) cases. However, this Court recently rejected this assertion in *Hopewell Enterprises, Inc. v. Trustmark National Bank*, 680 So.2d 812 (Miss. 1996), noting that:

> This Court has never held that the relationship between a mortgagor and mortgagee is a fiduciary one. (citations omitted). At best, we have held that a mortgagor and mortgagee are in a relationship of trust and that a mortgagee should not be allowed to abuse that relationship. . . . A mortgagor-mortgagee relationship is not a fiduciary one as a matter of law, nor are there sufficient facts in the case *sub judice* to create a fiduciary relationship.

*Hopewell*, 680 So.2d at 812.

¶18. This Court's rejection in *Hopewell* of the notion that a fiduciary relationship exists as a matter of law between a mortgagor and mortgagee is based on sound considerations of law and also on the realities of said relationship. A holding that the mortgagor/mortgagee relationship is, as a matter of law, a fiduciary one would serve to impose fiduciary concepts upon what is, in many cases, a standard contractual relationship between parties with fundamentally different interests. Such a holding would also be contrary to the law governing the mortgagor/mortgagee relationship in the overwhelming majority of other jurisdictions in this country.[2]

¶19. A classification of a given relationship as fiduciary as a matter of law is properly reserved for certain relationships such as that between a guardian and ward or between a trustee and a beneficiary of a trust. In these relationships, one party justifiably places trust and confidence in the other to act in a manner that is consistent with the interests of the party placing said trust and reliance. Clearly, the

relationship between the mortgagor and mortgagee is quite different from the aforementioned relationships and is properly entered into and carried out in a manner similar to other contractual relationships: with diligence, caution, and with knowledge of the subject matter of the contract.

¶20. This Court thus concurs with the view of the vast majority of courts that have considered this issue that the relationship between a mortgagor and mortgagee is not a fiduciary one as a matter of law.[3] Having so decided, the issue then arises as to whether a fiduciary relationship arose under the particular facts of this case. This Court concludes that there is not substantial evidence in the record supporting the chancellor's conclusion that a fiduciary relationship arose between Williamson and the Bank in the present case.

¶21. An indication of what type of fact pattern might cause the mortgagor/mortgagee relationship to rise to the level of the fiduciary is found in *Mitchell*, wherein this Court discussed cases of foreign jurisdictions which imposed liability upon banks for frauds perpetrated by bank officers:

> The only distinguishing point in most of these cases is that the courts generally found a fiduciary relationship between the bank and its customer(s) based on past dealing and the plaintiffs' reliance upon the banks advice, which apparently were not present in the present case.

*Mitchell*, 359 So.2d at 1379. In the present case, the record is devoid of facts which would take the relationship between the Bank and Williamson out of the scope of the generally non-fiduciary mortgagor/mortgagee relationship. As in *Hopewell,* there is no evidence that the relationship between Williamson and the Bank was anything other than "an arms-length business transaction involving a normal debtor-creditor relationship." *Hopewell*, at 4. Moreover, there is no evidence that the Bank exercised "dominion and control over Williamson", nor are there any other facts which would support the conclusion that a fiduciary relationship existed between the parties.

¶22. Although this Court thus rejects the notion that the relationship between Williamson and the Bank is fiduciary either as a matter of law or under the particular facts of this case, the mortgagee is nevertheless not permitted to act in whatever manner it deems to be in its best interests. This Court noted in dicta in *UHS-Qualicare v. Gulf Coast Com. Hosp.*, 525 So.2d 746, 757 (Miss. 1987) that "every contract contains an implied covenant of good faith and fair dealing." This Court is concerned in the present case solely with the duty of good faith as it relates to mortgage contracts, and we hold (as the Bank, Williamson, and amicus curiae agree) that this duty of good faith and fair dealing should properly apply to mortgage contracts. A duty of good faith and fair dealing also arises from the Uniform Commercial Code, which applies to the note in the present case. Miss. Code Ann. §75-1-201(19).

¶23. There is insufficient evidence in the record supporting a finding that the Bank breached the duty of good faith and fair dealing which it owed to Williamson.[4] This Court has not had the opportunity to clearly define the scope of the duty of good faith and fair dealings in the context of mortgage contracts, but it is clear that said duty entails a significantly lower standard of care than that owed in the fiduciary context. The record supports a conclusion that the Bank and the Hamiltons were merely protecting their respective economic interests in a reaction to Williamson's failure to make the payments called for under the note which she and her husband had executed. This Court notes that Williamson executed the $12,522.29 promissory note *subsequent* to her lease-purchase agreement with the Hamiltons, and the Hamiltons were understandably concerned about the execution of said

note on the property which they had contracted to lease and possibly purchase.

¶24. Once it became clear to the Hamiltons that the note payments would not be made and that a foreclosure thus threatened their interests under the lease-purchase agreement, it is understandable that they would attempt to protect their own interests by seeking an assignment of the Bank's interest under the note. Williamson argues that the Bank's actions served to interfere with her agreement with the Hamiltons, but the record supports a conclusion that the greater interference to said contract was caused by the Williamsons' actions in executing the note on the properties covered by the agreement and failing to make payments on said note. The actions taken by the Hamiltons and by the Bank in the present case were mere reactions to the initial default on the note by the Williamsons, and this Court places substantial weight on this fact.

¶25. Williamson complains that she was not provided with notice of the assignment of the note, but notice of said assignment was mailed to her attorney. Recording of the assignment was delayed to offer more time to Williamson, thus indicating an intent on the part of the Bank to work with her to resolve their difficulties. There is also a lack of substantial evidence supporting the chancellor's conclusion that the Bank breached any duty by failing to educate Champion regarding the difference between buying and paying off a note.

¶26. The chancellor concluded that Champion was mistaken about the meaning of "buying" a note and that she was, in reality, attempting to "pay off" said note. This conclusion, which serves as part of the basis for the chancellor's ruling that the bank had committed a breach of various duties, is not supported by the record. To the contrary, the record clearly supports an inference that Champion correctly spoke regarding her intentions and that she did not intend to pay off the note for the benefit of her niece at all, but rather to buy the note. Williamson testified regarding Champion's intentions thusly:

Q: You had asked Mrs. Champion to pay off the note ?

A: No, I did not ask her; she offered.

Q: To pay off the note ?

A: She offered to help me any way she could that would not compromise her money.

Q: What I'm trying to get at, Mrs. Williamson, is exactly what did Mrs. Champion tell you that she would do?

A: She said she would buy the note.

Q: Did you understand that to mean that she would pay it off ?

A: No, I understood that to mean she would buy the note because she had said he would sell it to the Hamiltons, and she said well, I will buy the note.

Q: What did you understand that would mean for you if Mrs. Champion bought the note ?

A: That she would foreclose on Tom and I, that she would protect my interest as far as she would get her money back, and then it would be her way of protecting my interest in the

property.

Q: And she was going to foreclose if she bought the note ?

A: That is what I understood, yes.

Champion's intentions were clear: to assist her relative but at the same time to protect her own financial interests. Testimony indicated that it was her intention to purchase the note and foreclose on the property herself rather than have a third party conduct the foreclosure. It does appear that Champion was in fact confused about the distinction between buying and paying off a note, but her intentions to protect her interests and to foreclose on the property herself could only have been accomplished by a purchase, rather than a pay-off of the note. If there were any doubt in this regard, said doubt is largely removed by the fact that Champion could have paid off the mortgage to the Hamiltons even after the assignment, and her failure to do so indicates that such was not her intent at all. With regard to this argument, Williamson responds that:

> Further, the Bank would have this Court apply a "but for" test to facts which occurred *after* the tortious conduct had been committed, *i.e.*, but for the fact that Carolyn Williamson failed to satisfy the debt after the assignment of the Note and Deed of Trust to the Hamiltons, foreclosure would not have occurred. In actuality, the Banks' complaint on this issue is that Ms. Williamson failed to mitigate her damages after the Bank had breached its duties. Unfortunately for the Bank, failure to mitigate damages is an affirmative defense which must be asserted in the answer to the complaint and must be proven at trial. ***Wall v. Swilley***, 562 So.2d 1252, 1258 (Miss. 1990). The Bank neither pled for proved that defense.

¶27. Thus, Williamson responds to the Bank's argument that she could have protected her interest just as well by paying off the note to the Hamiltons as by paying the money to the Bank by raising a procedural objection regarding the Bank's failure to plead and prove the affirmative defense of lack of mitigation of damages.

¶28. The fact that Williamson *did not* pay off the note does, as she states, constitute a failure to mitigate her damages (assuming, arguendo, that a breach and damages occurred), but the fact that the Bank knew at the time of the assignment that she *could have* paid off the note to the Hamiltons in spite of the assignment relates to the issue of the good faith of the bank in making the assignment in the first place and in its dealings with Williamson and Champion. Clearly, this is not a case where the Bank knew that, by making the assignment, Williamson would lose her rights to the property or where her legal rights would be compromised.

¶29. The Bank understood that Williamson would have the same legal right to make her mortgage payments after the assignment as before the assignment, with the only difference being the address to which the payments would be sent. As mortgagees, the Hamiltons were only permitted to foreclose upon the property if the mortgage payments were not made, and, even then, they were required to advertise the property for sale and conduct a public sale, at which any person, including Williamson and Champion, could have bid on some or all of the property. This Court concludes that this point of error is well-taken and the chancellor's ruling regarding the Bank's breach of a fiduciary duty and of the duty of good faith and fair dealing is accordingly reversed.

**II. DID THE ASSIGNMENT BY THE BANK OF THE NOTE AND DEED OF TRUST CONSTITUTE AN INTENTIONAL INTERFERENCE WITH WILLIAMSON'S RIGHTS UNDER A LEASE-PURCHASE AGREEMENT FOR THE PROPERTY SECURING THE NOTE ?**

¶30. The chancellor concluded that the Bank intentionally interfered with Williamson's contractual rights pursuant to the lease-purchase agreement with the Hamiltons by assigning the mortgage to the Hamiltons. This conclusion is not supported by substantial evidence in the record. In *Galloway v. Travelers Insurance Co.*, 515 So.2d 678, 682 (Miss. 1987), this Court noted the elements of a claim for intentional interference with contractual or business relations:

> (1) That the acts were intentional and willful;
>
> (2) that the defendants' actions were calculated to cause damage;
>
> (3) that the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendants; and
>
> (4) that actual damages and loss resulted.

*Galloway* 515 So.2d at 682. In addition, the plaintiff must also demonstrate that a enforceable obligation existed between the plaintiff and another party. See: *Irby v. Citizens National Bank of Meridian*, 121 So.2d 118 (Miss. 1960). Williamson's proof is lacking in this regard.

¶31. The lease-purchase agreement between Williamson and the Hamiltons provided that, at the end of the first two years of the lease, the monthly payments would be "renegotiated within terms suitable to both parties." In essence, the contract in the present case was thus only for a two-year period and said contract merely expressed the expectation that, following the two-year period, it would be renegotiated at terms suitable to both parties. Thus, there are serious doubts as to whether the contract was an enforceable one following the initial two-year period. This issue need not be decided, however, given that it is clear that the assignment of the mortgage to the Hamilton's had no effect on the lease-purchase agreement in question.

¶32. The fact that the Bank's indebtedness was assigned to the Hamiltons did not alter the lease-purchase agreement, to the extent that such an agreement even existed following the initial two year period. Williamson remained the owner of the property until foreclosure divested her of title to some of the property, and, even after the assignment, she was able to exercise whatever rights she possessed against the Hamiltons under the lease-purchase agreement. The assignment did not give the Hamiltons title to the Williamson's property, and the lease-purchase agreement did not terminate upon said assignment.

¶33. Williamson's argument that the assignment interfered with her rights in the lease-purchase agreement also loses considerable strength in light of the fact that she had stopped making payments on the mortgage securing her property. By being unable or unwilling to pay the mortgage, Williamson's days on her property were numbered, and the property would have been foreclosed upon and the lease-purchase agreement extinguished regardless of whether the Bank or the Hamiltons served as the foreclosing party. As with the breach of duty issues, the fact that Williamson

and/or Champion failed to make any mortgage payments to the Hamiltons following the assignment serves as strong evidence in support of the Bank's contention that Champion did not attempt a pay-off, but rather a purchase, of the mortgage.

¶34. In addition to the elements of causation, the chancellor's ruling was erroneous as it relates to the requisite proof regarding the Bank's intent. As noted in *Galloway*, this Court has held that the plaintiff must demonstrate that the defendant's actions were "calculated to cause damage" and that said acts were taken "without right or justifiable cause on the part of the defendants." Williamson presented insufficient evidence that the Bank's actions in assigning the note to the Hamiltons were taken for any motive other than to protect their own legitimate business interests or that they were intended to cause harm to her. Kilby testified that the Bank would have foreclosed upon the property themselves upon Williamson's default on the mortgage, and it is understandable that they would consider it in their best interests to allow the Hamiltons to deal with the foreclosure rather than dealing with it themselves.

¶35. Williamson complains that the Hamiltons were able to secure an unfair advantage of sorts through the assignment, but the Hamiltons' actions in foreclosing on the property upon continued default was no different than that taken by other mortgagees in the face of a default on mortgage payments. Moreover, the Hamiltons were required to comply with the same legal requirements of notice and public sale which the Bank would have been required to comply with had it foreclosed on the property.

¶36. In summary, there is not substantial evidence in the record in support of the chancellor's conclusion that the Bank tortiously interfered with Williamson's business or contractual relationship with the Hamiltons. Accordingly, this Court reverses the chancellor's ruling in favor of Williamson in its entirety and renders judgment in favor of the Bank. This Court finds it unnecessary to consider the remaining points of error, dealing primarily with issues relating to damages, which are rendered moot by this Court's holding herein.

¶37. **REVERSED AND RENDERED.**

**BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., SULLIVAN, P.J., AND PITTMAN, J.**


**McRAE, JUSTICE, DISSENTING:**



¶**38.** I disagree with the majority's decision to reverse and render the award of damages granted by the lower court. There is sufficient evidence in the record to indicate that Merchants & Planters Bank breached its duty of good faith and fair dealing to Carolyn Williamson. Moreover, the record clearly shows that Williamson relied, to her detriment, on Kilby's representation that he would notify her if her estranged husband failed to make payments on their loan. Accordingly, I dissent.

¶39. In every contract, there is an implied covenant of good faith and fair dealing. ***UHS-Qualicare v. Gulf Coast Community Hospital***, 525 So. 2d 746, 757 (Miss. 1987); Miss. Code Ann. § 75-1-201(19). The majority correctly holds, therefore, that a duty of good faith applies to the mortgage contract at issue. However, the majority incorrectly determines that the facts of this case do not amount to a breach of that duty by Kilby and the Bank.

¶40. The record indicates that Dick Kilby, the bank president, was aware that Williamson and her husband were estranged. Kilby and the Bank further were aware that three of the five parcels of land in question were titled solely in Carolyn Williamson's name. Williamson notified Kilby of her new address in Jackson after she returned to Mississippi and requested that she be kept abreast of the loan status since Tom Williamson was making the payments. Although Kilby would not send separate notices to both Williamsons, he assured her that she would be notified if payments were not made. Carolyn Williamson apparently relied on his assurances.

¶41. After Williamson returned to Mississippi, her relationship with the Hamiltons deteriorated. Tom Williamson telephoned Robert Hamilton and informed him, for the first time, about the existence of the deed of trust in favor of the Bank. Robert Hamilton understood from that conversation that Tom Williamson did not intend to make any more payments on the note. Concerned that foreclosure of the deed of trust might jeopardize his interest in the property under the terms of the lease-purchase agreement, Hamilton met with Kilby on December 20, 1985 about purchasing the Williamsons' note and deed of trust. The Bank, however, made no effort to notify Carolyn Williamson that the note was one month in arrears or of Hamilton's intentions.

¶42. On February 28, 1986, the Bank entered into an agreement with Hamilton to assign the Williamsons' note and deed of trust for $8,617.26, the outstanding balance on the note. The Bank admitted that, although her current address was on file, Carolyn Williamson was never advised of the transaction.

¶43. On March 3, 1986, Carolyn Williamson telephoned Kilby and inquired about the status of the note. At this time, Kilby informed Williamson about the Bank's assignment agreement with Hamilton. Kilby testified that, for the first time, Carolyn told him about her differences with Hamilton.

¶44. On March 4, 1986, the Bank mailed a certified letter to Tom and Carolyn Williamson, with copies to Carolyn Williamson's attorney and to the Hamiltons, advising them of the assignment agreement. This letter, which was sent only to the Texas address, stated that the assignment would be postponed until March 11, 1986, and that unless "the debt is relinquished prior to that date, the Bank will proceed with its plan to assign its note and deed of trust to Mr. and Mrs. Hamilton." Having learned of the postponement of the assignment, Carolyn Williamson belatedly sought help from her aunt, Wilmer Champion, who attempted unsuccessfully to pay off or "buy" the note in full.

¶45. Because the Bank, and specifically, Kilby, its president, were aware that Williamson and her husband were estranged, and that much of the land involved was titled solely in her name, it was incumbent upon the Bank, pursuant to its duty of good faith and fair dealing, to keep not only Tom Williamson, but also Carolyn Williamson, abreast of the situation with the banknote, as she had requested. At the very least, timely notification should have been sent to her at the Jackson address she provided. Accordingly, I dissent.

**LEE, C.J., SULLIVAN, P.J., AND PITTMAN, J., JOIN THIS OPINION.**

1. Overruled on other grounds.

2. See: *Judd v. First Federal Savings and Loan*, 710 F.2d 1237, 1241-42 (7th Cir. 1983) (applying Indiana law); *Janes v. First Federal Savings and Loan*, 312 N.E.2d 605, 610 (Ill. 1974); *First Bank of Wakeeney v. Moden*, 681 P.2d 11, 13 (Kan. 1984); *Federal Land Bank v. Fedner*, 410 A.2d 344, 348 (Pa. 1979); *Security Bank of Utah v. Banberry Dev. Corp.*, 786 P.2d 1326, 1332 (Utah 1990).

3. 59 **Corpus Juris Secundum** § 294(b) *Mortgages* supports this view, citing *Collum* for the proposition that: "While it has been stated broadly that the relationship between the mortgagor and mortgagee is one of trust, technically it is not of a fiduciary character, . . . and contracts between the two are regarded and treated as any other contracts would be."

4. This Court in *Hopewell* cited the present case and distinguished the facts herein from the facts in *Hopewell* based on the actions of the Bank in the present case being not being in "accordance with customary business practices." See: *Hopewell*, 680 So.2d at 816. This Court has since had occasion to reconsider the facts of the present case and concludes on this petition for rehearing that the slip opinion cited in *Hopewell* should be withdrawn and the present opinion substituted therefor. The facts in the present case may be somewhat unconventional, but a closer examination of the Bank's action indicate that said actions did not prejudice Williamson's legal rights.