IN THE COURT OF APPEALS

7/15/97

OF THE

STATE OF MISSISSIPPI

NO. 96-CA-00111 COA

FIRST TOWER LOAN, INC. APPELLANT

v.

B.W. CURRY, III, AND J.R. CURRY APPELLEES

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. SEBE DALE

COURT FROM WHICH APPEALED: FORREST COUNTY CHANCERY COURT

ATTORNEYS FOR APPELLANT: PAT SCANLON

ATTORNEY FOR APPELLEES: ERIK LOWREY

NATURE OF THE CASE: CONTRACT

TRIAL COURT DISPOSITION: DENIED RELIEF SOUGHT BY FIRST TOWER, WHICH
SOUGHT INJUNCTION TO SUBSTITUTE COLLATERAL SECURING A PLEDGE

AGREEMENT.

MOTION FOR REHEARING FILED:7/29/97

CERTIORARI FILED: 10/7/97

MANDATE ISSUED: 12/17/97

BEFORE BRIDGES, C.J., COLEMAN, AND SOUTHWICK, JJ.

BRIDGES, C.J., FOR THE COURT:

First Tower Loan, Inc. (Tower) brought this action against B.W. Curry III and J.R. Curry (collectively Currys) in the Chancery Court of Forrest County[1] seeking an injunction to substitute collateral that was security for a pledge agreement entered into among the parties to this action. The chancellor in Forrest County ruled in favor of Curry and refused to grant the relief sought by Tower. It is from this refusal that this appeal arises.

## FACTS

Tower and Eagle Federal Bank for Savings (Eagle) entered into a sale/purchase agreement (agreement) on November 30, 1992, whereby Tower purchased from Eagle certain loan contracts entered into by Eagle with various borrowers around the State of Mississippi. Tower's due diligence led them to the conclusion that 2%, or approximately $191,000, of the outstanding balances of all of the loans would be uncollectible ("known losses"). As protection against further unanticipated known losses not found during due diligence, the Agreement required Eagle to place $50,000 in escrow. If Tower were to determine within fourteen days after the execution of the Agreement that known losses would exceed 2%, Tower could draw on the escrowed amount.

Sometime prior to the execution of the Agreement, Tower discovered through its analysis of Eagles receivables that the known losses would exceed the sum of the initial 2% estimate ($191,000) and the escrowed amount ($50,000) by some $320,000. This increased Tower's known loss estimate to $561,000. The Agreement in its original form would not give adequate security to Tower.

In order to facilitate the execution of the Agreement, a pledge agreement (pledge) was entered into between Tower and B.W. Curry and J.R. Curry (the Currys)(major stockholders in Eagle). In the Pledge, the Currys expressly disagreed with Tower's new known loss estimate of $561,000. Nevertheless, in order to facilitate the execution of the Agreement, the Currys pledged their stock in Eagle, which was valued at $320,000, to secure any additional known losses. In the Pledge, Tower agreed that during the next eighteen months, it would exercise its "best efforts" to collect on all of the receivables transferred from Eagle. The parties further agreed to undertake an accounting and settlement at the end of the eighteen month period.

A few months into the eighteen month period, Tower began to "charge off" (put on inactive status due to difficulty of collection) many of the accounts it had bought from Eagle. In fact, by the end of 1993, only thirteen months after the November 30, 1992 signing of the Agreement and Pledge, Tower had charged off $560,000 and claimed said amount as charge off loss on its 1993 tax return. Curiously, the $560,000 was within $1,000 of the full amount to which Tower was secured pursuant to the Agreement and Pledge.

About seven or eight months into the eighteen month period, Eagle was dissolved, and its assets were liquidated, thereby rendering the stock pledged by the Currys worthless. This litigation was instigated by Tower eleven months into the eighteen month period due to the fact that the Currys' stock in Eagle had been rendered worthless. The chief executive officer of Tower, Jack Lee, was aware of the dissolution and participated therein as a stockholder of Eagle. This suit arose after Curry refused to deposit with Tower $320,000 under the Pledge. Subsequently, after the filing of this suit, Curry did pay into the registry of court the sum of $320,000. After trial the clerk disbursed $120,000 of the $320,000 in view of the fact that Tower's ultimate demand against Curry was only $172,264.91.

## STANDARD OF REVIEW

Our standard of review in this case is well established. "This Court will not disturb the chancellor's findings unless the chancellor was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 402 (Miss. 1997). "For questions of law, our standard of review is de novo." *Smith v. Dorsey*, 599 So. 2d 529, 533 (Miss. 1992).

## ARGUMENT AND DISCUSSION OF LAW

I. WHETHER THE CHANCERY COURT ERRED IN DECIDING THAT TOWER HAD NOT USED ITS BEST EFFORTS TO COLLECT THE LOANS IT PURCHASED FROM EAGLE.

The question of whether Tower used its best efforts in collecting the loans it had purchased from Eagle is strictly a factual one. Moreover, the answer to this question may be found in the testimony of the principals and employees of both Tower and Eagle. This Court has thoroughly reviewed the record in this case, as well as the chancellor's findings of fact and conclusions of law. We find the chancellor's opinion to be well reasoned and thorough. More importantly, however, we find that the chancellor's opinion was supported by the evidence in this case. "If a chancellor's findings are supported by substantial, credible evidence, this Court will not reverse." *Merchants & Planters Bank of Raymond*, 691 So. 2d at 402.

The chancellor heard the testimony of Gene Kreuz. Kreuz was formerly a vice president of Tower and the president of one of its subsidiaries, Tower Loan of Mississippi. Kreuz was responsible for the collection of Eagle accounts. He testified that he did not advise the office manager of the provisions of the Pledge. He also did not give quarterly status reports regarding the charge offs.

The chancellor also heard the testimony of Jimmy Childres, Tower's accountant. Childres concluded that Curry owed Tower $172,264.91 pursuant to the Pledge. It was noted by the chancellor,

however, that the information from which Childres derived his conclusion was provided by Tower's attorney and received little, if any, independent verification by Childres.

Jack Lee, chief executive officer and chairman of the board of Tower, did not testify as to any personal knowledge of the collection of the Eagle accounts. He did, however, testify as to the existence of a policy in support of a line of credit Tower had with Deposit Guaranty National Bank that would have precluded Tower's performance of its part of the Pledge. This policy required that Tower's accounts not be open for more than five months. Clearly, both parties to the Pledge had agreed that collections on Eagle accounts would go on for at least eighteen months.

B.W. Curry, Jr., the founder of Eagle, testified as to the various methods available to work delinquent accounts. His testimony revealed that minimal diligence could produce very good results in the collection of the delinquent accounts. The chancellor also heard the testimony of Sara Thornhill by deposition. Thornhill previously worked for Eagle and then was retained by Tower after the sale of the Eagle loans. Thornhill was a branch manager and testified extensively as to the handling of the Eagle accounts by Tower. She testified that the Eagle accounts were not given the same attention that the Tower accounts were afforded. She also positively stated that she did not exercise her best efforts in collecting the Eagle accounts. It should be noted that Thornhill was a disinterested witness in that she left Tower voluntarily prior to the beginning of this litigation. This and other substantial evidence clearly supports the chancellor's decision that Tower did not use its best efforts in the collection of the accounts it had purchased from Eagle. Accordingly, we find no merit to this issue.

II. WHETHER THE CHANCERY COURT ABUSED ITS DISCRETION IN EXCLUDING RELEVANT EVIDENCE AND WHETHER THIS WAS PREJUDICIAL TO AND AFFECTED SUBSTANTIAL RIGHTS OF TOWER.

Tower's second issue deals mainly with complaints about the climate of the trial. In other words, Tower is unhappy with the way they were treated by the chancellor during the proceedings. This Court finds the majority of the complaints in Tower's laundry list to be unsupported by any legal authority. We shall not address these. We will, however, address Tower's attempted offer of proof during the direct examination of Jack Lee.

During the direct examination of Jack Lee, Tower's attorney sought to elicit from Lee a comparison between the delinquency rate associated with Eagles loans prior to Tower purchasing them and after Tower had purchased and worked them for some period of time. Lee's answer regarding the pre-Agreement delinquency rate brought an objection from Curry's attorney. The objection was that any testimony regarding matters prior to the date of the Agreement, November 30, 1992, was violative of the parol evidence rule and is irrelevant. The chancellor agreed and sought to limit any offer of proof made by Tower's attorney to general inquiries as to what the testimony of Lee would have been on this matter.

Tower's attorney again sought specific responses from Lee to questions about pre-Agreement matters. The objection was renewed, and the chancellor went to great lengths to explain to Tower's attorneys his concerns about any expansion of the terms of the Agreement that would be in violation of the parol evidence rule. The chancellor further explained that pursuant to Mississippi Rule of Evidence 103(a)(2), an offer of proof should include the substance of the evidence and not the

specifics of the evidence. The chancellor likened the word "substance" to a summary of the evidence. We agree. Tower's attorney then abandoned his effort to offer his proof on delinquency rates.

Rule 103(a)(2) of the Mississippi Rules of Evidence reads in pertinent part as follows:

**Rule 103. Rulings on Evidence**

**(a) Effect of Erroneous Ruling.** Error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

"Before a party may secure appellate reversal on an evidentiary exclusion, that party must have placed in the record the substance of the evidence he would have offered had the court ruled otherwise." *Heidel v.State*, 587 So. 2d 835, 844 (Miss. 1991). See also *Brown v. State*, 338 So. 2d 1008 (Miss. 1976). We are unable to find worthy guidance from either the rule or the case law in Mississippi as to the meaning of the word "substance."

We are able, however, to find some guidance from the Fifth Circuit Court of Appeals. That court recently said the following about Federal Rule of Evidence 103(a)(2):[2]

Rule 103(a)(2) only requires that the proponent of excluded evidence show in some fashion the substance of his proposed testimony, and Rule 103(b) leaves the form of the offer within the discretion of the trial court. Admittedly, this framework renders the requirements of proffer less than definite, as the adequacy of a given formal proffer will necessarily depend upon its particular circumstances.

*United States v. Ballis*, 28 F3d 1399, 1406 (5th Cir. 1994). This Court can find no error in the chancellor's treatment of Tower's offer of proof. Accordingly, we find no merit to this issue.

III. WHETHER THE CHANCELLOR ERRED IN DISMISSING COUNT TWO OF TOWER'S COMPLAINT.

Tower complains that the chancellor erred when he dismissed Count Two of its complaint. Count Two alleged violations of Miss. Code Ann. § 79-4-14.07(d)(2) relating to the liabilities of shareholders after the dissolution of a corporation. This section is part of the Mississippi Business Corporation Act and is only applicable to business corporations and not to banking corporations. Miss. Code Ann. § 79-4-1.40. Eagle was a federally chartered savings bank and was governed by federal savings bank law. Therefore, we find that Section 79-4-14.07(d)(2) does not apply to the dissolution of Eagle. We can find no error in the chancellor's dismissal of this count. Accordingly, we find no merit to this issue.

**THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS HEREBY AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.**

**McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR. HERRING, J., NOT PARTICIPATING.**

1. This case was originally filed in Hinds County Chancery Court on October 18, 1993. Venue was subsequently transferred to Forrest County.

2. Federal Rule of Evidence 103(a)(2) is identical to Mississippi Rule of Evidence 103(a)(2).