# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-01361-SCT

*GENERAL MOTORS ACCEPTANCE CORPORATION*

*v.*

*MENOLA BAYMON*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/01/97 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HUMPHREYS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANDREW L. FREY |
| | EVAN M. TAGER |
| | MIRIAM R. NEMETZ |
| | JESS H. DICKINSON |
| ATTORNEYS FOR APPELLEE: | DON BARRETT |
| | BRIAN HERRINGTON |
| | JOHN T. MURRAY |
| | SYLVAI M. ANTALIS |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 02/18/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |

**BEFORE PRATHER, C.J., BANKS AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On September 20, 1995, the Appellee, Menola Baymon (hereinafter "Baymon"), sued the Appellant, General Motors Acceptance Corporation (hereinafter "GMAC"), in the Circuit Court of Humphreys County, Mississippi. Baymon asserted claims for breach of contract and fraud. Baymon claimed that

GMAC violated its duty of good faith and fair dealing regarding the purchase of insurance for Baymon's car after she allowed her own insurance policy to lapse. In April 1996, the Complaint was amended to add GMAC employee Sharron Mitchell as a co-defendant and to add claims of fraud and fraudulent concealment and breach of fiduciary duties.

¶2. GMAC moved before trial to exclude evidence concerning the rate-setting method of Motorists Insurance Company (hereinafter "MIC"), a subsidiary of GMAC and the company from which GMAC purchased Baymon's auto insurance. GMAC argued that MIC's conduct was irrelevant to the issues in the case since MIC was not a defendant and MIC's rates had been subject to regulatory review and approval. The court granted GMAC's motion.

¶3. A five-day trial was held in June of 1997. At the close of Baymon's case, GMAC and Mitchell moved for a directed verdict on all counts, alleging that there was insufficient evidence to support Baymon's claims. The Defendants also moved for a mistrial as a remedy for the admission of improper evidence concerning MIC's rate-setting and suggesting that GMAC's insurance program targeted racial minorities. The court directed a verdict for Mitchell. The court also granted GMAC's motion for a directed verdict on damages for emotional distress, based on its view that Baymon's testimony concerning the threat of repossession was too equivocal to support such damages. However, the court denied GMAC's other motions.

¶4. Following the trial, the jury returned a verdict in favor of Baymon on all counts, awarding her $35,000 in compensatory damages, and punitive damages of $5,000,000. GMAC moved for a judgment notwithstanding the verdict, a new trial or for a remittitur of the damages awards, but was denied by the court. Aggrieved by the proceedings below, GMAC appeals to this Court raising the following issues:

**I. THE TRIAL COURT ERRONEOUSLY DENIED GMAC'S MOTIONS FOR DIRECTED VERDICT OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT.**

**A. GMAC DID NOT BREACH ITS CONTRACT WITH BAYMON.**

**B. GMAC DID NOT BREACH THE DUTY OF GOOD FAITH AND FAIR DEALING.**

**C. BAYMON FAILED TO ESTABLISH THE ELEMENTS OF HER FRAUD CLAIM.**

**D. BAYMON FAILED TO ESTABLISH HER FIDUCIARY DUTY CLAIM.**

**II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY:**

**A. ALLOWING IRRELEVANT AND PREJUDICIAL TESTIMONY AND ARGUMENT SUGGESTING THAT GMAC'S USE OF COLLATERAL PROTECTION INSURANCE IS RACIALLY DISCRIMINATORY;**

**B. PERMITTING BAYMON'S EXPERT WITNESSES TO TESTIFY REGARDING MATTERS OUTSIDE THEIR AREAS OF EXPERTISE;**

**C. ADMITTING EVIDENCE CONCERNING THE REASONABLENESS OF THE RATES CHARGED AND THE PROFITS EARNED BY THE SELLER OF THE INSURANCE THAT GMAC PURCHASED TO COVER BAYMON'S CAR; AND**

**D. GIVING JURY INSTRUCTIONS NOS. 6, 7, 9, AND 10**

**III. THE AWARD OF COMPENSATORY DAMAGES WAS UNSUPPORTED BY THE EVIDENCE AND/OR GROSSLY EXCESSIVE.**

**IV. THE AWARD OF PUNITIVE DAMAGES WAS IMPROPER.**

¶5. This Court finds that lower court was correct when it refused to grant GMAC's motion for a directed verdict or judgment notwithstanding the verdict, but only regarding the claim for breach of contract. On this issue, Baymon presented adequate evidence to support her claim upon which reasonable minds could have differed. However, the reversible errors committed by the trial judge, and the excessive awards from the jury warrant a new trial. Therefore, this Court reverses the jury's decision and award below and remands this case for a new trial consistent with the findings in this opinion.

## STATEMENT OF FACTS

¶6. In July of 1991, Menola Baymon bought a new Mitsubishi Galant from Regency Mitsubishi in Jackson, Mississippi. Baymon signed a retail instalment sale contract (which was subsequently assigned to GMAC) agreeing to make monthly payments of $395.42 over a period of five (5) years. Under the terms of the instalment contract, Baymon agreed to keep the car insured against loss or physical damage as long as any portion of her account remained unpaid. In the event that Baymon ceased to maintain insurance coverage on the vehicle, the instalment contract gave GMAC the right to purchase insurance and charge Baymon for the cost of that insurance plus a finance charge. Specifically, the instalment contract provided:

> You agree to have physical damage insurance covering loss or damage to the vehicle for the term of this contract. At any time during the term of this contract, if you do not have physical damage insurance which covers both the interest of you and the Creditor in the vehicle, then the Creditor may buy it for you. If the Creditor does not buy physical damage insurance which covers both interests in the vehicle, it may, if it decides, buy insurance which covers only the creditor's interest.

> The Creditor is under no obligation to buy any insurance, but may do so if it desires. If the Creditor buys either of these coverages, it will let you know what type it is and the charge you must pay. The charge will consist of the cost of the insurance and a finance charge, at the highest lawful contract rate. You agree to pay the charge in equal installments along with payments shown on the payment schedule.

The instalment contract also gave GMAC the right to repossess the car upon Baymon's breach.

¶7. Baymon conceded that she understood her obligation to maintain property damage insurance on her vehicle. She initially fulfilled that requirement by obtaining coverage from State Farm. However, due to alleged financial difficulties, Baymon let the State Farm policy lapse as of March 30, 1992 and purchased no other insurance.

¶8. Soon thereafter, Baymon began receiving notices from GMAC concerning the need to keep the vehicle insured. The first notice advised Baymon of the lapse and of her obligation to keep the vehicle insured. Furthermore, it informed her that GMAC would purchase collateral protection insurance (hereinafter "CPI") , if she did not renew her own policy, stated the premium for that coverage and encouraged her to get her own insurance.

¶9. Two (2) weeks later, a phone call was made to State Farm to determine whether coverage had been reinstated. Several weeks after the phone call, GMAC sent a second notice to Baymon, advising her that GMAC had purchased CPI. The letter included a three (3) page certificate explaining the terms of coverage, and disclosing the premium paid by GMAC and the effective date and termination date of the coverage. GMAC purchased one year of coverage from MIC, a subsidiary of GMAC, for the period of May 24, 1992, to May 24, 1993. GMAC paid the $1654 premium to MIC by check on August 28, 1992. GMAC claimed that the insurance it purchased was the most inexpensive policy available in Mississippi.

¶10. On September 1, 1992, GMAC sent Baymon a third notice confirming that they had purchased CPI for her car, disclosing the premium and coverage period, and notifying her of GMAC's intent to add the premium, plus a finance charge, to her monthly payments. Baymon testified that she called GMAC "once or twice" after receiving the notices. GMAC's records reflect that on September 15,1992, Baymon called GMAC and directed them to add the premium to her monthly car payments which increased the payments by about $44 to $439.64 per month.

¶11. In November of 1992, Baymon requested and received a 60-day extension in her payment schedule. In April 1993, a notice was sent to Baymon indicating that the initial CPI certificate would expire on May 24, 1993, and that GMAC would renew it for another twelve months at a cost of $836 unless she provided proof of her own coverage. When GMAC received no response from Baymon, GMAC paid the $836 premium to MIC for coverage from May 24, 1993 to May 24, 1994. On July 1, 1993, GMAC billed Baymon's account for the additional premium, increasing her monthly payment approximately $25 to $464.53 effective July 22, 1993. Before the second CPI policy expired, Baymon secured her own insurance. Accordingly, on March 28, 1994, GMAC retroactively canceled its insurance as of January 31, 1994 (the date Baymon obtained her own insurance), and credited Baymon's account with the return premium received from MIC. This reduced her monthly payments to $455.44.

¶12. On September 20, 1995, the Appellee, Menola Baymon (hereinafter "Baymon"), sued GMAC claiming that it breached its contract, breached its duty of good faith and fair dealing and breached its fiduciary duties. Baymon did not dispute that GMAC had a contractual right to purchase CPI when she allowed her coverage to lapse. However, Baymon claimed that the contract she entered into with GMAC provided that borrowers were responsible for reimbursing GMAC for its "cost" of procuring collateral protection insurance if and when a particular borrower failed to maintain her own insurance.

¶13. Baymon complained that GMAC's "cost" of CPI was improperly inflated by additional charges and instead amounted to a "premium." According to Baymon, the premium included three (3) unauthorized components: (1) a commission; (2) excessive and concealed profits; and (3) an administrative expense of tracking GMAC's loan portfolio. Baymon alleges that this "premium" amount far exceeded what it actually "cost" GMAC to obtain the coverage.

¶14. Baymon also alleged that GMAC committed fraud. Baymon claimed that GMAC should have informed her that MIC was its subsidiary. Additionally, although the right of repossession was included in the instalment contract, GMAC had a written policy never to repossess a borrower's vehicle for failure to pay the add-on insurance. Nonetheless, Baymon claimed that when she failed to pay the insurance portion of her monthly payment, GMAC repeatedly threatened her with the repossession of her car if she did not make the payment. As a result of the alleged harassment, Baymon also claimed that she suffered emotional distress.

¶15. GMAC denied all of Baymon's claims and moved for a judgment notwithstanding the verdict at the close of Baymon's case. GMAC also moved for a mistrial, alleging the admission of improper evidence and complaining that Baymon's counsel repeatedly suggested that members of racial minorities were most often the targets of CPI.

¶16. Following the trial, the jury returned a verdict in favor of Baymon on all counts, awarding her $35,000 in compensatory damages, and punitive damages of $5,000,000. GMAC moved for a judgment notwithstanding the verdict, a new trial or for a remittitur of the damages awards, but was denied by the court. Taking exception with the trial court's decision, GMAC raises the issues below.

## DISCUSSION OF THE ISSUES

### I. THE TRIAL COURT ERRONEOUSLY DENIED GMAC'S MOTIONS FOR DIRECTED VERDICT OR FOR JUDGMENT NOTWITHSTANDING THE VERDICT.

**Standard of Review**

¶17. In *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373 (Miss. 1997), we held that our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are identical. In *Steele*, we stated specifically that:

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Steele*, 697 So. 2d at 376 (citation omitted).

¶18. GMAC argues that the trial judge committed reversible error in denying its motions for a directed verdict and judgment notwithstanding the verdict and asserts the following issues in support of its argument:

**A. GMAC Did Not Breach Its Contract With Baymon.**

**a. GMAC Did Not Breach The Duty Of Good Faith And Fair Dealing.**

**b. Baymon Failed To Establish The Elements of Her Fraud Claim.**

**c. Baymon Failed To Establish Her Fiduciary Duty Claim.**

¶19. This Court disagrees. The record reflects that Baymon supported her arguments with sufficient evidence upon which reasonable minds could have differed. As a result, the trial judge properly denied GMAC's motion for summary judgment.

**A. GMAC Did Not Breach Its Contract With Baymon.**

¶20. GMAC's first contention is that it did not breach the instalment contract which it entered with Baymon

regarding the purchase of the Mitsubishi automobile. A term of the contract permitted GMAC to purchase insurance on her vehicle and charge her "the cost of the insurance and a finance charge, at the highest lawful contract rate." Baymon concedes that GMAC had the right to purchase the CPI, but claims that GMAC violated the contract by charging her for the insurance "premium" instead of the insurance "cost." Baymon claims that the premiums included a number of self-serving charges that GMAC used to bolster its profits.

¶21. In *Simmons*, we held that:

> The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standards. A court must effect a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.

*Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42-43 (Miss. 1992), (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)). "It is well settled that the words of a contract are to be given their ordinary meanings." *Continental Cas. Co. v. Hester*, 360 So. 2d 695, 697 (Miss. 1978).

¶22. Black's Law Dictionary defines "cost" as "[t]he sum or equivalent expended, paid or charged for something." BLACK'S LAW DICTIONARY 345 (6th ed. 1990).

¶23. In the case *sub judice*, there is a dispute over the meaning of the "cost" of the insurance. Does "cost" represent the actual expense of the policy only or does it include other policy-related charges paid by GMAC to MIC for Baymon's CPI policy - i.e., the premium?

¶24. In the present case, after GMAC informed Baymon of the coverage it was purchasing on her vehicle and the amount she would be charged, GMAC paid MIC $1654 and $836, respectively, for Baymon's first and second CPI certificates. Baymon contends that GMAC breached its contract because the premiums it paid MIC included: (1) compensation for tracking the loan portfolios of debtors that was provided to GMAC; (2) amounts paid back to GMAC as "commissions;" and (3) "excess profits" supposedly earned by MIC on its CPI program. Baymon claimed that she was overcharged a total of $762 because these elements were allegedly included in the premium for the first CPI certificate.

¶25. GMAC insisted that the contract expressly gave them the right to purchase CPI insurance on behalf of Baymon and to impose upon her the cost of that insurance. They assert that Baymon was thoroughly notified of the cost of this insurance and was encouraged to purchase her own. Only after Baymon repeatedly failed to comply did GMAC purchase the insurance. GMAC claimed that the additional charges included in the premiums were customary costs, standard in the insurance industry and that it was unreasonable for Baymon to claim that the "cost" of insurance would not include some profit.

¶26. Accordingly, reasonable minds could differ as to whether or not GMAC breached its contract with Baymon. Thus, this issue is remanded for consideration in a new trial.

### B. GMAC Did Not Breach The Duty Of Good Faith And Fair Dealing.

¶27. GMAC next contends that it did not breach an implied duty of good faith and fair dealing. Baymon claimed that GMAC breached its duty due to a number of wrongful acts including the threat of repossession to collect insurance premiums.

¶28. Concerning the implied duty of good faith and fair dealing we held in *Cenac* that "[a]ll contracts

contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss.1992) (citing *Morris v. Macione*, 546 So. 2d 969, 971 (Miss.1989)). "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205, 100 (1979)). However, in performing a contract, the parties are not prevented from "protecting their respective economic interests" or from asserting their rights in the event of a default. *Merchants & Planters Bank of Raymond v. Williamson*, 691 So. 2d 398, 405 (Miss. 1997).

¶29. The record does not reflect that GMAC violated any of its duties of good faith and fair dealing toward Baymon. When Baymon defaulted on her obligation to maintain auto insurance, GMAC took only those actions which were duly authorized by the contract. GMAC repeatedly notified Baymon that she was violating her agreement and gave her several opportunities to remedy her breach. On the contrary, GMAC's decision to purchase CPI instead of repossessing Baymon's car allowed her the continued benefit of her car. Therefore, this Court holds that GMAC did not breach its implied duty of fair dealing and good faith under the contract.

### C. Baymon Failed To Establish The Elements of Her Fraud Claim

¶30. GMAC contends that Baymon failed to prove that it was guilty of fraud. Baymon asserts that GMAC committed fraud when it failed to disclose that MIC was its subsidiary and failed to tell her that GMAC's stated policy prohibits the repossession of cars despite its contractual right to do so.

¶31. A successful claim of fraud requires proof of

    a. representation;

    b. its falsity;

    c. its materiality;

    d. the speaker's knowledge of its falsity or ignorance of its truth;

    e. his intent that it should be acted on by the hearer in the manner reasonably contemplated;

    f. the hearer's ignorance of its falsity;

    g. reliance on its truth;

    h. right to rely thereon; and

    i. consequent and proximate injury.

*Franklin v. Lovitt Equip. Co.*, 420 So. 2d 1370, 1373 (Miss. 1982).

¶32. In the instant case, this Court finds that no fraud is present.

¶33. First, Baymon does not demonstrate how GMAC's failure to disclose its identity as MIC's parent company constitutes fraud according to the above elements. Though not exclusive, the most notable missing element is that of injury. GMAC fully disclosed to Baymon the nature of the coverage and its price. Baymon was encouraged to obtain her own insurance. The record indicates that the price of the coverage

provided by MIC was comparable to, if not lower than, other policies of its kind. Additionally, when Baymon elected to renew her policy with State Farm, the record reflects that State Farm's premiums were higher than those of MIC.

¶34. Second, Baymon complains that GMAC defrauded her by threatening to repossess her car although it had a policy of not enforcing its contractual right of repossession. However, GMAC had no duty to disclose its internal policies relating to enforcement. GMAC never waived its right to repossess Baymon's car and could have done so at any time. Once again, GMAC's actions helped Baymon instead of harming her by allowing her the continued convenience of her car.

¶35. Thus, Baymon failed to prove that GMAC was guilty of fraud.

### D. Baymon Failed To Establish Her Fiduciary Duty Claim

¶36. GMAC denies that it owed any fiduciary duty to Baymon, or in the alternative that it did not violate the duties therein. Baymon claimed that GMAC's conduct in placing CPI on her vehicle violated a fiduciary duty it owed her.

¶37. "[T]he general rule is that there is no presumption of a fiduciary relationship between a debtor and creditor. . ." *Peoples Bank & Trust Co. v. Cermack*, 658 So. 2d 1352, 1358 (Miss. 1995); *see also* *Merchants & Planters Bank*, 691 So. 2d at 404. We further held in *Cermack* that

> Because of the severity of the burdens and penalties that are integral to a fiduciary relationship, the party seeking to prove the existence of the relationship must do so by clear and convincing evidence.

*Cermack*, 658 So. 2d at 1358. Further, this Court has repeatedly held that the power to foreclose on a security interest does not, without more, create a fiduciary relationship. *See, e.g.*, *Merchants & Planters Bank*, 691 So. 2d at 404; *Hopewell Enters. Inc. v. Trustmark Nat'l Bank*, 680 So. 2d 812, 816-17 (Miss. 1996).

¶38. Baymon is unable to demonstrate that her relationship with GMAC was fiduciary in nature. There is no evidence in the record that GMAC created an expectation in Baymon that it would protect her interests, nor that she was lulled into a false sense of security by relying on GMAC. Indeed, GMAC's repeated warnings that CPI might not fully protect Baymon's interests clearly prevented any fiduciary expectations on her part.

¶39. As a result, this Court finds that no fiduciary relationship existed between GMAC and Baymon.

¶40. After individually analyzing each of Baymon's claims, the only issue upon which reasonable minds could differ is whether or not GMAC breached its contract with Baymon by including other expenses in her insurance premium. The trial court properly denied GMAC's motion for a directed verdict or for judgment notwithstanding the verdict, but only regarding the breach of contract claim. There is simply no evidentiary basis to support any of Baymon's other claims and they should have been dismissed in favor of GMAC.

### II. THE TRIAL COURT COMMITTED SEVERAL REVERSIBLE ERRORS WHICH REQUIRE A NEW TRIAL

¶41. GMAC also argues that the trial court committed a number of errors which require a new trial. We

agree. The trial judge below allowed irrelevant and inflammatory testimony and evidence to be introduced to the jury. As a result, GMAC was irreparably prejudiced such that a reversal is required and a new trial necessary based on the errors below.

## A. ALLOWING IRRELEVANT AND PREJUDICIAL TESTIMONY AND ARGUMENT SUGGESTING THAT GMAC'S USE OF COLLATERAL PROTECTION INSURANCE IS RACIALLY DISCRIMINATORY WAS IMPROPER

¶42. GMAC first alleges that Baymon proffered irrelevant and prejudicial testimony implying that GMAC's CPI program disproportionately impacted racial minorities. GMAC claims that Baymon's counsel made an obvious effort to inflame the emotions of the jury, ten (10) of whose members were African-American. Baymon contends that the statements about the impact of the GMAC program on African-Americans is not a *per se* appeal to racial prejudice, especially where the evidence supports the reference.

¶43. Mississippi Rules of Evidence 402 and 403 address the admission of irrelevant and prejudicial evidence respectively. Rule 402 says in part that "[e]vidence which is not relevant is not admissible." M.R.E. 402. Rule 403 states that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

M.R.E. 403. In ***Shell Oil Co. v. Pou***, 204 So. 2d 155, 157 (Miss. 1967), we stated that, "[a]ppeals to passion and prejudice are always improper and should never be allowed." *See also **Mississippi State Highway Comm'n v. Hall***, 252 Miss. 863, 877, 174 So. 2d 488, 493-94 (1965) (condemning "the use of inflammatory language calculated to mislead the jury and which has no relation to the issues of fact which are being presented to the jury for determination.").

¶44. The court allowed one of Baymon's experts, Mr. Sibbring, to testify that during his years selling CPI policies in Ohio, he observed that CPI was disproportionately placed on racial minorities. Baymon's counsel, Don Barrett, emphasized this testimony in his summation, stating that, "[h]e [Sibbring] told you who the obvious targets were. . ."

¶45. Barrett went on to insinuate that Defendant Sharron Mitchell, an African-American, had been subject to racial discrimination as an employee of GMAC:

> Ms. Mitchell, she's obviously a very smart lady. She got her Masters, I believe. It sort of struck me that they never gave her any more responsibility than she had. I wonder about that, but they didn't.

In his rebuttal argument, Barrett wondered aloud, "what is she doing after 20 years, this lady this capable, this smart, with a master's degree. . .why do they have her in practically a clerical job? Why isn't she in management?"

¶46. GMAC moved for a mistrial, but the trial court denied GMAC's motion and refused to admonish counsel against continuing to make racially inflammatory arguments. Finally, in his argument to the jury on punitive damages, Barrett claimed openly that "[t]he uncontradicted evidence in this case is that GMAC's victims are working people on the economic edge, struggling, predominately. . .African-Americans."

¶47. This Court finds that the trial court erred in allowing Baymon to use irrelevant, prejudicial and inflammatory statements to prove that GMAC discriminated against African-Americans. Baymon introduced no proof of such actions by GMAC, save the unsupported declarations of her expert and counsel. Baymon's trial counsel blatantly played the "race card" before the jury which was over 90% African-American. Such unfounded declarations of racial bias irreparably infected the proceeding below. As such, the trial court was in error when it permitted the introduction of the statements and when it refused to grant GMAC's motion for a mistrial.

### B. PERMITTING BAYMON'S EXPERT WITNESSES TO TESTIFY REGARDING MATTERS OUTSIDE THEIR AREAS OF EXPERTISE CONSTITUTED ERROR.

¶48. GMAC contends that Baymon's experts were improperly allowed to testify concerning matters outside their areas of expertise. Baymon's contention that GMAC's conduct in obtaining CPI for her vehicle was wrongful rested almost entirely on the testimony of two witnesses who appeared as experts on her behalf - Donald Sibbring and Thomas Myers.

¶49. A witness "qualified as an expert by knowledge, skill, experience, training, or education" may testify and offer opinions if his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.E. 702. However, this Court will limit an expert's testimony to matters within his demonstrated area of expertise. *Seal v. Miller*, 605 So. 2d 240, 247. (Miss. 1992).

¶50. This Court finds that these experts were improperly allowed by the trial judge to testify to areas outside of their stated fields of expertise.

¶51. Thomas Myers was admitted as an expert in the area of lending practices. However, he professed no expertise regarding the insurance industry generally or CPI in particular. Nevertheless, Myers was permitted, over GMAC's objections, to present testimony and opinions regarding MIC's premiums and profits. For example, Myers was permitted to testify that MIC earned $28 million in profits on CPI in one year, and that MIC's profits for that year had exceeded the amounts predicted in state rate filings.

¶52. Baymon's second expert, Donald Sibbring, was accepted as an expert on CPI over GMAC's objections. Sibbring's claim to expertise was based on his experience selling and servicing CPI policies to ten (10) to twelve (12) companies. Sibbring had not sold CPI policies since 1984, and had never sold CPI in Mississippi. Sibbring was allowed to testify that GMAC "grossly overcharged" Baymon for insurance, should not have received any commission and should have recovered the costs of tracking its finance charges from all customers.

¶53. This assignment of error is proper. The court allowed Baymon's experts to testify far outside their fields of expertise and as such committed reversible error.

### C. ADMITTING EVIDENCE CONCERNING THE REASONABLENESS OF THE RATES CHARGED AND THE PROFITS EARNED BY THE SELLER OF THE INSURANCE THAT GMAC PURCHASED TO COVER BAYMON'S CAR WAS GROUNDS FOR A MISTRIAL

¶54. Before trial, GMAC moved to exclude evidence concerning MIC's rate-making on the ground that the conduct of MIC in setting its rates was irrelevant to GMAC's liability. The court granted GMAC's motion in

limine. GMAC claims that the court admitted proscribed evidence concerning MIC's rate-setting practices, and then failed to give adequate corrective instructions to the jury.

¶55. After granting a motion in limine, "[i]t is the trial court's responsibility to assume the initiative in compelling compliance with its order." *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988).

¶56. Despite its prior ruling, the court permitted Baymon to adduce a great deal of documentary evidence concerning MIC's rates for CPI. Through this evidence, Baymon argued that MIC's profits were excessive, that its rates amounted to "gouging" and that it had manipulated the rate approval process. The court claimed these admissions were proper on the ground that some reference to MIC "was necessary in order to show the purchase of insurance. . .the breakdown of the premium [and]. . .the other expenses as a result of the insurance costs."

¶57. Additionally, the court refused to give GMAC's proposed jury instruction No. D-5, which would have admonished the jury not to consider, among other things, the reasonableness of MIC's "rates", "rate-making," " rate filings," "actuarial practices" or "profits." The court, however, only gave the instruction that the jury could not consider "[t]he reasonableness of MIC's rates."

¶58. MIC's rate-setting practices and its actual profit levels had no relevance to GMAC's possible liability of charging Baymon more than the "cost" of the insurance. This evidence irreparably infected the trial and necessitates a new trial.

## D. GIVING JURY INSTRUCTIONS NOS. 6, 7, 9, AND 10 WAS REVERSIBLE ERROR.

¶59. GMAC's final assignment of error contends that the court seriously compounded its previous errors through its instructions to the jury, and eliminated any chance that the jury would decide the claims before it properly.

¶60. "[T]he Circuit Court enjoys considerable discretion regarding the form and substance of jury instructions." *Splain v. Hines*, 609 So. 2d 1234, 1239 (Miss. 1992). The "overarching concern is that the jury was fairly instructed and that each party's proof-grounded theory of the case was placed before it." *Id.* (citing *Rester v. Lott*, 566 So. 2d 1266, 1269 (Miss. 1990)). In Mississippi, "a party has the right to embody his theory of the case in his instruction if there is testimony to support it," but only " if made conditional upon the jury's finding that such facts existed." *Murphy v. Burney*, 27 So. 2d 773, 774 (Miss 1946).

¶61. First, GMAC complains that Instruction No. 6 on breach of contract was improper. The instruction stated:

> The Court instructs you that Defendant [GMAC] and Plaintiff Menola Baymon entered into a contract. The Court further instructs you that Plaintiff has alleged a breach of contract by Defendant [GMAC] by charging more than the cost of insurance or by failing to adequately inform Plaintiff concerning said insurance or the charge. If you find that Defendant [GMAC] did in fact breach said contract, you may return a verdict for Plaintiff and against Defendant [GMAC]. If you find defendant did not breach the contract you may return a verdict for the Defendant.

¶62. This instruction violated the holding in *Murphy*, *supra*, by suggesting that GMAC had, in fact, charged

more than the cost of the insurance and failed to adequately inform Baymon regarding the insurance. The instruction also failed to convey to the jury its obligation to determine whether or not Baymon's factual allegations were supported by evidence, and instead suggested that the court believed those facts to exist. Thus, the court's denial of GMAC's objection and its refusal to alter the instruction or make it conditional, was improper.

¶63. Second, GMAC argued that Instruction No. 7 regarding good faith and fair dealing was similarly flawed. This instruction reads:

> The Court instructs you that in every contract entered into in Mississippi there exists a duty of good faith and fair dealing. This means that parties to a contract must perform that contract with the [sic] good faith and with fair dealing toward on another. The Court further instructs you that Defendant [GMAC] and Plaintiff, Menola Baymon, both had duties of good faith and fair dealing toward one another. The Plaintiff alleges that Defendant GMAC breached its duty of good faith and fair dealing by accepting undisclosed commissions or other payment from MIC, or engaging in self-dealing, or failing to search for competitive pricing or failing to disclose the relationship between GMAC and MIC, or using the threat of repossession to collect insurance premiums and failed to disclose GMAC's policy not to repossess, or transferring GMAC's tracking expenses to Plaintiff, without disclosing this fact to Plaintiff, or automatically force-placing Plaintiff with MIC insurance without disclosing or offering other available options, and if you further find that by such acts GMAC did not act in good faith and deal fairly with Plaintiff, you must return a verdict in favor of Plaintiff.

This instruction likewise suggests that GMAC had in fact committed all of the acts alleged, and that the only issue for the jury to decide was whether such actions breached the duty of good faith and fair dealing. This instruction failed to convey to the jury its duty to determine the facts and drove home the impression that the court believed all of Baymon's allegations to be true.

¶64. Third, GMAC takes exception with Instruction No. 9 on fiduciary duty. That instruction said:

> The Court instructs you that the law defines a fiduciary relationship as one in which one party is in a position to exercise dominant influence upon the other party because of the latter's dependency upon the former arising or through trust [sic]. The law does not hesitate to categorize this relationship as fiduciary in character. If you determine from a preponderance of the evidence that GMAC held as security the title to Plaintiff's car and that GMAC thereby acquired such a position of dominance over Plaintiff and GMAC elected to place insurance and selected that insurance and took compensation therefore, and did such to GMAC's benefit and Plaintiff's detriment and if you further find that GMAC thereby breached the relationship of trust between the parties, you should award as damages the value of whatever you may find defendant to have gained as a result of this wrong.

¶65. This Court has held that the power to foreclose on a security interest does not by itself create fiduciary duties. *See Merchants & Planters Bank*, 691 So. 2d at 404. This instruction contravenes that law by inviting the jury to find that GMAC owed a fiduciary duty to Baymon solely because it held a security interest in her car. Moreover, a party to a contract does not breach any fiduciary duty by exercising its rights under the contract. This instruction was argumentative, confusing to the jury and put the trial court in a position of arguing for Baymon and was improper.

¶66. Finally, GMAC argues that Instruction No. 10 regarding fraud was erroneous. Instruction No. 10

reads:

> The Court instructs you that the law defines fraud as a material misrepresentation of a presently existing or past fact made with knowledge of its falsity and with the intention that the other party relied thereon resulting in a reliance by the party to his detriment. The Plaintiff alleges that GMAC committed fraud by accepting undisclosed commissions or other payments from MIC, or engaging in self-dealing, or failing to disclose the relationship between GMAC and MIC, or using the threat of repossession to collect insurance premiums and failed to disclose GMAC's policy not to repossess, or transferring GMAC's tracking expenses to Plaintiff, without disclosing this fact to Plaintiff, or automatically force-placing Plaintiff with MIC insurance without disclosing or offering other available potions, and if you find that said acts of GMAC fall within this definition of fraud and if you also believe from the evidence that Plaintiff suffered some harm as a result of her reliance on Defendant [GMAC's] said fraud, then you must return a verdict in favor of Plaintiff. However, if you do not find that [GMAC] breached such duty then your verdict must be for Defendant [GMAC].

¶67. Once again, the instruction improperly suggests that GMAC had in fact committed all of the acts alleged and that the only issue for the jury to decide is whether such actions constituted fraud. In addition, the instruction suggests that Baymon had, in fact, relied on fraudulent acts by GMAC, and that the only issue for the jury to determine was whether she suffered some harm as a result. The trial court's failure to communicate to the jury its obligation to determine the existence of each and every element of Baymon's fraud claim by clear and convincing evidence was reversible error.

### III. THE AWARD OF COMPENSATORY DAMAGES WAS UNSUPPORTED BY THE EVIDENCE AND/OR GROSSLY EXCESSIVE.

### IV. THE AWARD OF PUNITIVE DAMAGES WAS IMPROPER.

¶68. In light of the above finding of reversible error and this Court's decision to remand this case for a new trial, the issue of damages is moot. However, assuming Baymon had proved all that she alleged, her maximum damages would have totaled approximately $762, the difference between what she was charged for her first year of CPI and her second year. In response, the jury returned a verdict for $35,000 in compensatory damages and $5,000,000 in punitive damages. This Court finds this award excessive in light of the damages claimed by Baymon.

### CONCLUSION

¶69. The trial court was not in error when it refused to grant GMAC's motion for a directed verdict or judgment notwithstanding the verdict, but only regarding the issue of breach of contract. As to the remaining claims advanced by Baymon, they are dismissed. Additionally, the trial judge committed a litany of errors by admitting improper and irrelevant evidence. Finally, the jury award was excessive in light of Baymon's alleged damages. As a result, this Court reverses the jury's decision and award and remands this case for a new trial consistent with this opinion.

¶70. **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., PITTMAN, P.J., SMITH, MILLS AND WALLER, JJ., CONCUR. BANKS, J., CONCURS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY**

**McRAE, J. SULLIVAN, P.J., NOT PARTICIPATING.**

**BANKS, JUSTICE, CONCURRING IN PART:**

¶71. While I concur with the decision of the majority to reverse and remand this case for a new trial, I write separately to express my disagreement with Section II (B) of the majority opinion. In Section II (B), the majority concludes that both of Baymon's expert witnesses were erroneously allowed to testify regarding matters outside of their areas of expertise.

¶72. In my view, Thomas Myers, who was recognized as an expert in the area of lending practices, did not testify to any matters which were outside the field of lending practices. The testimony and opinions Myers did present strictly related to lending practices, and his opinions were based on review of financial documents provided to him in preparation for trial. He admitted to having no experience regarding the insurance industry or collateral protection insurance, and he presented no testimony regarding such. Moreover, the specific example to which the majority refers, testimony by Myers that MIC earned $28 million in profits on CPI in one year and that these profits had exceeded the amounts predicted, was not expert testimony, but merely his observation of what was documented in the financial reports. Such testimony is not expert testimony, which involves testimony regarding scientific, technical, or other specialized knowledge which will assist the trier of fact to understand a fact in issue. *See* M.R.E. 702.

¶73. The second expert, Donald Sibbring, was recognized as an insurance expert based on his experience selling CPI. He did not qualify as an expert on rate filings or on expense allocation, yet he was allowed to testify that GMAC should have recovered its tracking costs from all customers. Sibbring was further allowed to testify that GMAC grossly overcharged Baymon and that the finance company should pay for the costs of tracking. I agree with the majority that these opinions are probably outside the scope his expertise. The trial court should proceed with particular care in assessing the admissibility of such testimony on remand.

**McRAE, J., JOINS THIS OPINION IN PART.**