KITCHENS, Justice,
concurring in part and in result:
¶ 63. I agree that this case should be reversed and remanded. However, I write separately to discuss my disagreement with the majority’s holding that the trial court abused its discretion in allowing expert testimony from Dr. Glenda Glover. Therefore, I concur in part and in result.
¶ 64. The majority acknowledges Reb-elwood’s concession that Dr. Glenda Glover is qualified as an expert in economics, but goes on to say that “... her opinion, as presented in this case, was not based on accurate, truthful facts.”
¶ 65. The accuracy or truthfulness of facts is a matter to be sorted out by a jury. See Davis v. Temple, 129 Miss. 6, 91 So. 689, 690 (1922). If Rebelwood, or any other party to the litigation, disagrees with facts presented and/or relied upon by its adversary, its remedy is not to have that evidence excluded by a judge. Rather, a party in disagreement with its opponent’s factual representations is at liberty to expose the perceived inaccuracies by cross-examination, and by the presentation of different, opposing evidence through its own witness.
¶ 66. Rebelwood had those options in this case. Its disagreement with Dr. Glover’s methodology and her conclusions *498 could have been presented to the jury through an opposing expert, an option which Rebelwood chose not to exercise.
¶ 67. In the recent case of Gulf South Pipeline Co., LP v. Pitre, 35 So.3d 494 (Miss.2010), we undertook to prescribe the methodology to be utilized by real estate appraisers. Now, we take on that same task in the field of economics. Is there no field of human endeavor in which this Court does not believe itself to know more than the real experts? Are there no limits upon the substitution of our judgment for that of the jurors who hear and observe the testifying experts for the parties to the disputes that juries exist to decide? Once Dr. Glover had been accepted by the trial court as an expert in her field, the efficacy of her opinions, or the lack thereof, was for the jury to decide. The so-called “gate-keeping” role of the court ended when the trial judge allowed her to enter the gate by accepting her as an expert, a duty which Rebelwood concedes the trial judge properly performed.
¶ 68. In this case, Dr. Glover, whose qualifications as an economist are not in dispute, based her calculation of Crystal’s future income on the national average income of a high school graduate with aspirations of becoming a nurse. Dr. Glover testified that she learned of Crystal’s aspirations of becoming a nurse from Crystal’s father and other relatives who reported that she had obtained applications from Hinds Community College and Mississippi College as a step toward fulfillment of the educational requirements for a career in nursing.
¶ 69. The plaintiffs relied on Classic Coach, Inc. v. Johnson, 823 So.2d 517 (Miss.2002). In Classic Coach, this Court found it permissible for an expert economist to calculate the future income of two college-aged men who were killed in an accident. One of them was twenty-one years of age, had one child, and had worked at Waffle House and played in a band for several years while working toward his college degree. Id. at 528. The other young man had recently dropped out of college for a semester to earn money to finance the remainder of his education. Id. In Classic Coach, the expert calculated future income based on three different averages: (1) an individual earning minimum wage; (2) average wage for a high school graduate; and (3) average wage for a college graduate. The trial judge accepted the calculation for that of the average college graduate, even though one of the young men had a several-year work history and the other had left college to work, when awarding damages for the loss of these individuals’ future income. Id. The calculation in Classic Coach is analogous to that in the case sub judice. Dr. Glover based the lost income of Crystal on that of a high school graduate with aspirations of becoming a nurse.
¶ 70. Rebelwood failed to adduce evidence to contradict the conclusions of Dr. Glover. This Court has long held that uncontradicted testimony which was not impeached must be accepted as true. See James v. Mabus, 574 So.2d 596 (Miss.1990) (inherently probable, reasonable, credible, and trustworthy testimony uncontradicted by evidence must be accepted as true); Hearin-Miller Transporters, Inc. v. Currie, 248 So.2d 451 (Miss.1971) (testimony of a witness which is not contradicted, either by direct evidence or by circumstances, must be taken as true); Hulitt v. Jones, 220 Miss. 827, 72 So.2d 204 (1954) (same); Tombigbee Elec. Power Ass’n v. Gandy, 216 Miss. 444, 62 So.2d 567 (1953) (where testimony of witness is uncontra-dicted and he is not impeached in some manner known to the law nor contradicted by the physical facts, such testimony must be accepted); Ryals v. Douglas, 205 Miss. *499 695, 39 So.2d 311 (1949) (the uncontradict-ed testimony of witness who is not impeached must be accepted as true); Stevens v. Stanley, 153 Miss. 809, 122 So. 755 (1929) (jury as well as judge is bound by uncontradicted reasonable testimony); Stewart v. Coleman & Co., 120 Miss. 28, 81 So. 653 (1919) (testimony must be taken as true where not contradicted either by direct evidence or by circumstances).
¶71. Finally, Rebelwood alleges that “[r]ace was injected” into the economist’s testimony by Dr. Glover’s responding to a question regarding the “Mississippi Black Effect.” A thorough review of the record reveals that the plaintiffs’ attorney and Dr. Glover were discussing the low salaries of persons living in Mississippi and Arkansas. Thereafter, Plaintiffs’ counsel asked how the “Mississippi Black Effect” affects the salary of someone in Crystal’s position. Defense counsel objected, and Plaintiffs rephrased the question to ask, “Explain to the jury in the process of doing these economic reports how the numbers relate to somebody is [sic] ... poor as opposed to somebody who is rich and if those are considerations that you look at.” The colloquy went on as follows:
A. Well, economist[s] are well aware of the disparity in numbers, again, in Mississippi and in Arkansas, but normally, since we’re talking about Mississippi, there is a disparity because if you look at the $6.70 and use that over her life — well, I’m just going to say, you know, there is an inherent assumption in that a black person in Mississippi has no value, that life is almost valueless. In the life, if you’re going to be say $6.70 an hour for life for an individual at age 23, just because that person was working in preparation for something else, for a higher profession, I mean, that’s why we use the national average because it eliminates that discriminatory [sic] on the numbers.
Q. And in all fairness, that would also apply to white people, too?
A. Yeah. Poor, it’s poor in general, but it’s more often applied to black Americans in the models that we have come in contact with.
¶ 72. The foregoing is a legitimate part of Dr. Glover’s explanation of her methodology and is a far cry from her having played a “race card,” as suggested by the majority. Therefore, Gen. Motors Acceptance Corp. v. Baymon, 732 So.2d 262 (Miss.1999), is inapplicable. The trial court did not err in allowing Dr. Glover to use a national average to calculate the value of Crystal’s future income.
¶ 73. For the foregoing reasons, I respectfully concur in part and in result.